[No. F017322. Fifth Dist. Apr. 15, 1993.]

THE PEOPLE, Plaintiff and Respondent, v.
JOHNNY BARRERA, Defendant and Appellant.

## COUNSEL

Charles M. Bonneau, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Robert R. Anderson, Assistant Attorney General, W. Scott Thorpe and Janett H. Shaw, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**GILDNER, J.*—**

### INTRODUCTION

On June 5, 1990, the electorate adopted Proposition 115, the "Crime Victims Justice Reform Act." (*Raven v. Deukmejian* (1990) 52 Cal.3d 336, 340 [276 Cal.Rptr. 326, 801 P.2d 1077].) Among its avowed purposes, as stated in the preamble, was " '. . . to create a system . . . in which violent criminals receive just punishment, . . .' " (*Id.* at p. 342.) Toward that end, Penal Code[1] section 206, defining the crime of torture, and section 206.1, prescribing its punishment, were enacted.

Section 206 provides:

"Every person who, with the intent to cause cruel or extreme pain and suffering for the purpose of revenge, extortion, persuasion, or for any sadistic purpose, inflicts great bodily injury as defined in Section 12022.7 upon the person of another, is guilty of torture.

"The crime of torture does not require any proof that the victim suffered pain."

Section 206.1 provides:

"Torture is punishable by imprisonment in the state prison for a term of life."

Appellant, Johnny Barrera, mounts a broad attack upon these statutes. He contends: section 206 is vague and overbroad and violates equal protection

---

*Judge of the Kern Superior Court sitting under assignment by the Chairperson of the Judicial Council.

[1] Unless otherwise indicated, all further statutory references are to the Penal Code.

guarantees of the state and federal Constitutions, that prosecutions cannot be brought because other statutes cover the same conduct it prohibits and that its elements are improperly set forth in CALJIC No. 9.90. He also argues that punishment for torture constitutes cruel and/or unusual punishment under the state and federal Constitutions. He additionally asserts sentencing error in that the trial court failed to state reasons for imposition of the upper term when sentencing on a gun use enhancement and, in his supplemental brief, that the sentence is an indeterminate life term, not 15 years to life as reflected in the judgment and commitment order.

We will affirm in all particulars except sentencing.

## STATEMENT OF THE CASE

In November 1991 Barrera was tried with a codefendant on a multicount amended information alleging, among other felonies and enhancements, torture, a violation of section 206. The jury found him guilty of that and other counts, and found true, inter alia, a gun use enhancement (§ 12022.5). Prior felony convictions were found true by the court. Barrera was sentenced to an indeterminate term of 15 years to life on the torture charge and the upper term on the gun enhancement. Other crimes resulted in consecutive sentences or stayed punishment.

## STATEMENT OF FACTS

The victim, Lawrence Rodarte, and his sons Jessie (six years old) and Lawrence, Jr. (eight years old), were in bed about 11:30 p.m. on the night of June 30, 1991. The boys were asleep on sofas in the living room. Rodarte got up and went outside for fresh air and heard a noise.[2] Rodarte saw four men approach him, one of whom was Barrera. Rodarte greeted Barrera by name. One of the men was wearing a ski mask. Rodarte ran back into the apartment, pursued by the men. He was unable to latch the door because a shotgun barrel was shoved against it. Lawrence, Jr. awoke and began to cry as the men entered and his father announced they were being robbed. He told his son to call 911.

Rodarte was grabbed by the hair and forced to sit in a chair. Codefendant held a sawed-off shotgun against Rodarte's head, and another robber held a knife against Rodarte's throat. Barrera demanded money, and Rodarte gave him $70 that was in his pocket. Defendant asked if Rodarte had any weapons and threatened to shoot Rodarte if he did not tell him where the guns were.

---

[2]Lawrence, Jr. testified he heard a knock at the door and saw his father get up and answer it.

Lawrence, Jr. said a rifle was in the bedroom, and Barrera went to the bedroom and brought back a .22-caliber rifle.[3]

Barrera stood in front of Rodarte, pulled the trigger, and stated the gun did not work. When Rodarte told him the safety for the gun was on, Barrera released it, pointed the weapon at Rodarte's right leg, and fired. Rodarte's leg was broken when struck by the bullet, and he bled profusely. Barrera asked if Rodarte's leg hurt, demanded more money, and when Rodarte refused to tell him where the money was, Barrera threatened to shoot Lawrence, Jr.

Rodarte gave in to the threat and started to rise but was shoved into the chair and told he would be killed if he moved. He pleaded with the robbers that they spare his son. He told Barrera the money was outside in the work shed and a key to the shed was in a cabinet.

When the codefendant could not find the key, Rodarte was forced to walk to the shed (about 15 feet) to find the key. Barrera kicked open the door to the storage building and took approximately $300 hidden in a sofa stored in the building. Barrera also kept the .22-caliber rifle.

All the robbers left except the one wearing the ski mask and holding a knife.[4] This robber jabbed Rodarte a few times with the knife, leading Rodarte to believe the man remained behind in order to stab him. The last time Rodarte was jabbed, he blocked the blow and fell down. The robber then left.

Unable to walk back to the house, Rodarte told Lawrence, Jr. to call police, which he did. Rodarte was transported to Valley Medical Center, where he was hospitalized for three days. When released, his leg was in a cast and he had to walk with the aid of crutches. He had suffered an open fracture of his right tibia.

While still recuperating, on August 18, 1991, Rodarte was confronted by codefendant and another individual when they came to Rodarte's apartment. Present with Rodarte were two friends and Lawrence, Jr. Lawrence, Jr. recognized one of the men from the robbery and told his father. Rodarte warned those with him to get out of the way because he was not sure what was going to happen. The men were looking for an individual named Larry. As he was turning to leave, the codefendant threatened to kill Rodarte if

---

[3]Lawrence, Jr. testified he did not say where the weapon was. Rodarte testified Lawrence, Jr. retrieved the rifle, whereas Barrera testified he retrieved it.

[4]Lawrence, Jr. believed this robber to be codefendant.

Barrera was sent to prison. The codefendant also told Rodarte that it was he, not defendant, who shot him.

Rodarte admitted using PCP in June and August 1991, but denied being involved in the sale of drugs. Prior to testifying, but after the robbery, Rodarte shot himself in the ear while drunk. At the time of trial, Rodarte had charges pending for gross negligence in the discharge of a firearm (§ 246.3).

The officer responding to the scene of the robbery and shooting testified Rodarte did not mention money being taken from his pocket. Similarly, Rodarte did not mention being jabbed with a knife. Lawrence, Jr. told the officer he did not recognize the robbers and that he had never seen any of them before the night of the robbery. The officer was told by Rodarte that the robbers left on foot.

Rodarte's second statement was taken by Fresno Police Detective Krug on July 1, 1991. Rodarte identified Barrera, stated $200 was taken from the sofa, and that the men left in a primered black Toyota or Nissan. Rodarte stated there was a possibility Barrera and he had been involved in past marijuana transactions. Barrera had worked around the apartment building and was on the premises earlier on the day of the robbery and shooting. Krug saw no visible lacerations on Rodarte, although Rodarte stated the robbers struck him around the head with the gun butt. Lawrence, Jr. also testified the robbers hit his father on the head.

Rudy Gonzales, Rodarte's neighbor, testified Barrera had been to Rodarte's apartment in the past. Each time, Barrera was looking for marijuana, and Rodarte responded by telling Barrera he was no longer using it.

The victim's estranged wife, Claudine Rodarte, testified Rodarte was dishonest.

I

*Section 206 Is Neither Vague Nor Overbroad*

▉▉▉▉ ▉▉ Barrera contends that under state and federal constitutional principles section 206 is vague and overbroad.[5] ▉▉ He argues that "torture" requires, as part of its definition, "the length of pain or the

---

[5]Barrera provides no separate analysis or discussion supporting his assertion the section is overbroad. His point is therefore without foundation for purposes of this appeal (*People* v. *Ham* (1970) 7 Cal.App.3d 768, 783 [86 Cal.Rptr. 906]) and deemed abandoned (*Estate of*

manner in which it is inflicted." "Cruel pain," he says, is vague. So is "any sadistic purpose," which is also overbroad as a "catch-all" in cases where "motive or purpose of an attack cannot be determined."

██ The rule covering challenges to statutes based upon vagueness is well settled, and was fairly recently set forth by our Supreme Court:

"Article I, section 7, of the California Constitution and the Fourteenth Amendment to the United States Constitution both assure that no person shall be deprived of 'life, liberty, or property without due process of law.' Among the implications of this constitutional command is that the state must give its citizenry fair notice of potentially criminal conduct. This requirement has two components: 'due process requires a statute to be definite enough to provide (1) a standard of conduct for those whose activities are proscribed and (2) a standard for police enforcement and for ascertainment of guilt.' (*Burg* v. *Municipal Court* (1983) 35 Cal.3d 257, 269 [198 Cal.Rptr. 145, 673 P.2d 732], cert. den. 466 U.S. 967 [80 L.Ed.2d 812, 104 S.Ct. 2337]; see also *Kolender* v. *Lawson* (1983) 461 U.S. 352, 357-358 [75 L.Ed.2d 903, 908-909, 103 S.Ct. 1855].)" (*Walker* v. *Superior Court* (1988) 47 Cal.3d 112, 141 [253 Cal.Rptr. 1, 763 P.2d 852].)

██ Section 206 enjoys "presumptive validity," and " '. . . is sufficiently certain if it employs words of long usage or with a common law meaning "notwithstanding an element of degree in the definition as to which estimates might differ." [Citations.]' " (*People* v. *Ballard* (1988) 203 Cal.App.3d 311, 316, 317 [249 Cal.Rptr. 806].)

"Torture" has a long-standing, judicially recognized meaning:

"Torture has been defined as the 'Act or process of inflicting severe pain, esp. as a punishment in order to extort confession, or in revenge.' (Webster's New Int. Dict. (2d ed.).) The dictionary definition was appropriately enlarged upon by this court in its original opinion in *People* v. *Heslen,* 163 P.2d 21, 27 in the following words: 'Implicit in that definition is the requirement of an intent to cause pain and suffering in addition to death. That is, the killer is not satisfied with killing alone. He wishes to punish, execute vengeance on, or extort something from his victim, and in the course, or as the result of inflicting pain and suffering, the victim dies. That intent may be manifested by the nature of the acts and circumstances

*Scott* (1949) 90 Cal.App.2d 21, 24-25 [202 P.2d 357]; see also *Utz* v. *Aureguy* (1952) 109 Cal.App.2d 803, 807 [241 P.2d 639]; see generally Cal. Rules of Court, rule 13). In addition, section 206 does not attempt to control or prevent any activities constitutionally subject to state regulation in a manner that invades an area of protected freedoms. (*NAACP* v. *Alabama* (1964) 377 U.S. 288, 307 [12 L.Ed.2d 325, 338, 84 S.Ct. 1302].)

surrounding the homicide.' (See disposition of that case on rehearing, 27 Cal.2d 520 [165 P.2d 250].) . . .

"In determining whether the murder was perpetrated by means of torture the solution must rest upon whether the assailant's intent was to cause cruel suffering on the part of the object of the attack, either for the purpose of revenge, extortion, persuasion, or to satisfy some other untoward propensity. The test cannot be whether the victim merely suffered severe pain since presumably in most murders severe pain precedes death." (*People* v. *Tubby* (1949) 34 Cal.2d 72, 76-77 [207 P.2d 51].)

Torture combines a specific state of mind with a particular type of violent conduct causing significant personal injury. To require, as Barrera argues, an inquiry into the duration of the pain experienced or the manner in which it was inflicted incorrectly shifts the emphasis from the perpetrator. (See *People* v. *Wiley* (1976) 18 Cal.3d 162, 173 [133 Cal.Rptr. 135, 554 P.2d 881].) It is even more significant that section 206 does not require proof the victim suffered pain. As written, section 206 continues the *Tubby* definition.

As Barrera acknowledges, the term "cruel" in the definition of torture withstands a challenge based upon vagueness. (*People* v. *Talamantez* (1985) 169 Cal.App.3d 443, 457 [215 Cal.Rptr. 542] [discussing torture murder].)

The phrases "any sadistic purpose" and "extortion" have consistently been used in this state in the area of torture murder without further definition being required. (See *People* v. *Raley* (1992) 2 Cal.4th 870, 888 [8 Cal.Rptr.2d 678, 830 P.2d 712]; *People* v. *Pensinger* (1991) 52 Cal.3d 1210, 1239 [278 Cal.Rptr. 640, 805 P.2d 899]; *People* v. *Steger* (1976) 16 Cal.3d 539, 544 [128 Cal.Rptr. 161, 546 P.2d 665, 83 A.L.R.3d 1206]; *People* v. *Davenport* (1985) 41 Cal.3d 247, 267 [221 Cal.Rptr. 794, 710 P.2d 861]; see also *People* v. *Wade* (1988) 44 Cal.3d 975, 993-994 [244 Cal.Rptr. 905, 750 P.2d 794] [torture-murder special circumstances not unconstitutionally vague, relying upon the established judicial meaning of torture].) Section 206 is not vague.

## II

### *Section 206 Does Not Violate Equal Protection Guarantees*

■ Barrera contends section 206 violates the equal protection guarantees of both the state and federal Constitutions (U.S. Const., Amend. XIV; Cal. Const., art. I, § 7) because individuals similarly situated (same criminal conduct) are punished differently under other penal statutes.

What is necessary to successfully challenge a statute on equal protection grounds is well settled:

" 'The first prerequisite to a meritorious claim under the equal protection clause is a showing that the state has adopted a classification that affects two or more *similarly situated* groups in an unequal manner.' (*In re Eric J.* (1979) 25 Cal.3d 522, 530 [159 Cal.Rptr. 317, 601 P.2d 549].) As Justice Frankfurter explained in *Tigner* v. *Texas* (1940) 310 U.S. 141, 147 [84 L.Ed. 1124, 1128, 60 S.Ct. 879, 130 A.L.R. 1321]: 'The Constitution does not require things which are different in fact or opinion to be treated in law as though they were the same.' (See also *In re Eric J., supra*, 25 Cal.3d at p. 530, fn. 1.)

" 'The equal protection clause does not assure defendant of the same treatment as all other felons; it assures him only . . . that he will receive like treatment with all other persons similarly situated.' (*People* v. *Enriquez* (1977) 19 Cal.3d 221, 229 [137 Cal.Rptr. 171, 561 P.2d 261, 3 A.L.R.4th 73].) Neither the Fourteenth Amendment of the Constitution of the United States nor the California Constitution (art. I, § 7; art. IV, § 16) precludes legislative classification with respect to persons who are different. (*In re Gary W.* (1971) 5 Cal.3d 296, 303 [96 Cal.Rptr. 1, 486 P.2d 1201].) Rather, the basic rule of equal protection is that persons similarly situated with respect to the legitimate purpose of the law must receive like treatment. (*In re Eric J., supra*, 25 Cal.3d at p. 531 [159 Cal.Rptr. 317, 601 P.2d 549]; *People* v. *Karsai* (1982) 131 Cal.App.3d 224, 243-244 [182 Cal.Rptr. 406].) Thus, only those persons who are similarly situated are protected from invidiously disparate treatment. (*People* v. *Macias* (1982) 137 Cal.App.3d 465, 472 [187 Cal.Rptr. 100].)

" . . . . . . . . . . . . . . . . . . . . . . .

" 'Persons convicted of *different* crimes are not similarly situated for equal protection purposes.' (*People* v. *Macias, supra*, 137 Cal.App.3d 465, 473; *People* v. *Corning* (1983) 146 Cal.App.3d 83, 91 [194 Cal.Rptr. 27]; *People* v. *Preciado* (1981) 116 Cal.App.3d 409, 413 [172 Cal.Rptr. 107]; *People* v. *Gayther* (1980) 110 Cal.App.3d 79, 91 [167 Cal.Rptr. 700]; *People* v. *Hughes* (1980) 112 Cal.App.3d 452, 459-460 [169 Cal.Rptr. 364].) '[I]t is one thing to hold, as did [*People* v. *Olivas* (1976) 17 Cal.3d 236 (131 Cal.Rptr. 55, 551 P.2d 375)] that persons convicted of the *same crime* cannot be treated differently. It is quite another to hold that persons convicted of *different crimes* must be treated equally.' (*Smith* v. *Municipal Court* (1978) 78 Cal.App.3d 592, 601 [144 Cal.Rptr. 504].)" (*People* v. *Jacobs* (1984) 157 Cal.App.3d 797, 801-803 [204 Cal.Rptr. 234].)

With regard to section 206, the electorate's intent was to enact "a new crime of torture" (Analysis by the Legislative Analyst, Ballot Pamp., Criminal Law. Initiative Constitutional Amendment and Statute, Primary Elec.

(June 5, 1990) p. 32), apparently in response to the facts in *People* v. *Singleton* (1980) 112 Cal.App.3d 418, 420-422 [169 Cal.Rptr. 333].[6] (*Review of Selected 1990 Cal. Legis.—Prop. 115: The Crime Victims Justice Reform Act*, 22 Pacific L.J. 1010, 1012.) As we will explain in part III of this opinion, we believe section 206 realizes that goal. Torture is a new crime, different from others. The equal protection argument thus necessarily fails.

## III

### *The Punishment for Violation of Penal Code Section 206 Does Not Constitute Cruel and/or Unusual Punishment*

Defendant argues section 206 and the punishment it prescribes (§ 206.1) constitutes cruel and/or unusual punishment under the federal[7] and state Constitutions. According to defendant, section 206 is merely a definition of aggravated assault, yet it calls for an indeterminate sentence, whereas other aggravated assaults provide for determinate sentences. Other more serious offenses, the argument continues, carry a lesser penalty, such as attempted murder and battery with great bodily injury.

Barrera argues section 206 is nothing more than aggravated battery and therefore does not serve its stated purpose. Aggravated mayhem is already covered under section 205 in response to the facts, crime and resulting punishment in *People* v. *Singleton, supra,* 112 Cal.App.3d at pages 420-422. (*Review of Selected 1990 Cal. Legis.—Prop. 115: The Crime Victims Justice Reform Act, supra,* 22 Pacific L.J. at pp. 1012-1013.) Section 206, he continues, was written after section 205, and was also tailored to deal with the *Singleton* facts and punishment, although section 206 is far broader (infliction of great bodily injury but no requirement of permanent disability or disfigurement) than section 205. Under this same issue subheading, Barrera complains that motive has been made an element of the crime ("with the intent to cause cruel or extreme pain and suffering for the purpose of . . .").

---

[6]By motion Barrera requested we take judicial notice of portions of the ballot pamphlet and record of the joint hearing on Proposition 115. We deferred ruling on the motion pending consideration of the merits. The motion is granted.

[7]Barrera provides no separate Eighth Amendment analysis and his brief cites only to *Solem* v. *Helm* (1983) 463 U.S. 277 [77 L.Ed.2d 637, 103 S.Ct. 3001]. The Attorney General's brief relies on analysis developed by our state Supreme Court. We therefore do not address this federal constitutional argument, but do note in passing that the principles developed by our court are similar to those developed by the United States Supreme Court. (*Solem* v. *Helm, supra,* 463 U.S. at pp. 290-292 [77 L.Ed.2d at pp. 649-650].) We note also the federal high court's reminder that appellate courts, "of course, should grant substantial deference to the broad authority that legislatures necessarily possess in determining the types and limits of punishments for crimes[.]" (*Id.* at p. 290 [77 L.Ed.2d at p. 649].)

In *In re Lynch* (1972) 8 Cal.3d 410, 425-429 [105 Cal.Rptr. 217, 503 P.2d 921], the court identified techniques to determine if a punishment is disproportionate. (See also *People v. Dillon* (1983) 34 Cal.3d 441, 479-482 [194 Cal.Rptr. 390, 668 P.2d 697].) We are to look to the following: (1) the nature of the offense and/or offender; (2) comparison of the penalty in question with prescribed penalties for more serious offenses in the same jurisdiction; and (3) comparison of the penalty in question with penalties prescribed for the same offense in other jurisdictions.

### (1) *Nature of the Offense*

Looking to the nature of the offense, we are again guided by the *Lynch* decision which, in reviewing other cases, considered these additional factors: (1) the degree of danger the offense presents to society; (2) whether the offense is minor in nature; (3) the defendant's gain; (4) the extent of injury to others; and (5) the nonviolent versus violent nature of the offense. (8 Cal.3d at p. 425.)

Section 206, of course, describes a crime presenting a great danger to society. The crime is major in nature, rather than minor, involving in this instance financial gain to the perpetrator, extortion, violence, and great bodily injury to the victim. (See *People v. Dillon, supra,* 34 Cal.3d 441.)

With regard to the facts of this particular case (*In re Foss* (1974) 10 Cal.3d 910, 919 [112 Cal.Rptr. 649, 519 P.2d 1073]), Barrera shot Rodarte at close range as a means of inflicting enough pain upon the victim to gain the victim's cooperation and property. The bullet broke the victim's leg and he bled profusely. The life of the victim's son was threatened in the victim's presence and the immediate capability of carrying out that threat was evident: a sawed-off shotgun was held against his son's head. Again, the cooperation of the victim was behind the threat. The victim was forced to walk on his broken leg, described as an open fracture, in order to assist Barrera in locating the money he sought. Barrera's brief continually attempts to minimize the offense, labeling it merely an aggravated assault, but under these facts his conduct was manifestly more than that. His actions were cold-blooded, calculated, motivated by financial gain, and resulted in a great cost to his victim.

### (2) *Nature of the Offender*

*Dillon* pointed to a number of factors to use when determining the offender's individual culpability: "age, prior criminality, personal characteristics, and state of mind." (*People v. Dillon, supra,* 34 Cal.3d at p. 479.)

The report of the probation officer indicates Barrera was born in May 1959, making him 31 years old when the crime occurred. He was hardly a youthful offender. (See *People* v. *Dillon, supra,* 34 Cal.3d at pp. 479, 482.)

And he was hardly new to the criminal justice system. Four pages of the report of the probation officer are dedicated to his record of contacts, arrests, convictions and commitments. His criminal history began in 1972 in the juvenile court system: that history takes two pages to recount. His record reveals commitments to the California Youth Authority for battery upon another ward and auto theft. He was also convicted of armed robbery and burglary. He was released on parole in 1986 and "incurred six parole violations," resulting in his return to custody "for drug related offenses." Barrera was also continued on parole a number of times for "other parole violations."

There is no suggestion Barrera was suffering from any mental condition that would explain his behavior in the present case (see, e.g., *In re Lynch, supra,* 8 Cal.3d at pp. 430-431), or confronted with danger and acting under the type of fear and duress that the defendant in *Dillon* experienced. (*People* v. *Dillon, supra,* 34 Cal.3d at pp. 451-452, 482-483.) His state of mind at the time the crime was committed was that of a principal and perpetrator who acted cruelly and intentionally in order to inflict pain upon his unarmed, outnumbered victim for the purpose of obtaining the victim's cooperation to further his financial gain. Nothing about him or the record suggests otherwise.

### (3) *Comparison With Punishments for More Serious Crimes Within the Same Jurisdiction*

Barrera argues his offense of torture, based upon the facts of this case, is "demonstrably less serious then [*sic*] other comparable offenses which only carry a determinate sentence." Once more, he characterizes torture as aggravated battery, coupled with the motive to extort or inflict pain.

Barrera observes that the punishment for what he terms comparable crimes is considerably less than that which is mandated by section 206.1:

(1) Battery with serious injury (§ 243, subd. (d)), two, three, or four years;

(2) Assault with a deadly weapon with force likely to produce great bodily injury (§ 245, subd. (a)(1)), two, three, or four years plus a three-year enhancement for actually inflicting great bodily injury as was done in this case (§ 12022.7); and

(3) Attempted second degree murder with great bodily injury (§§ 664, 189), five, seven, or nine years, plus a three-year enhancement for actually inflicting great bodily injury as was done in this case (§ 12022.7).

Unlike these crimes and their punishments, the Legislature, the courts, and now the People by initiative have recognized the act of torture to be deserving of particular attention.

"A murder by torture was and is considered among the most reprehensible types of murder because of the calculated nature of the acts causing death, not simply because greater culpability could be attached to murder in which great pain and suffering are caused to the victim. (*People* v. *Steger* (1976) 16 Cal.3d 539, 544-546 [128 Cal.Rptr. 161, 546 P.2d 665, 83 A.L.R.3d 1206].)" (*People* v. *Wiley*, *supra*, 18 Cal.3d at pp. 168-169.)

The *Wiley* court continued:

"Most recently we had occasion to review a conviction of first degree murder predicated on torture in *People* v. *Steger*, *supra*, 16 Cal.3d 539. In holding the evidence of intent to inflict pain insufficient to support the verdict on that theory we again emphasized that 'it is not the amount of pain inflicted which distinguishes a torturer from another murderer, as most killings involve significant pain. [Citation.] Rather, *it is the state of mind of the torturer*—the cold-blooded intent to inflict pain for personal gain or satisfaction. . . . [W]e hold that murder by means of torture under section 189 is murder committed with a wilful, deliberate, and premeditated intent to inflict extreme and prolonged pain.' (16 Cal.3d at p. 546)." (*People* v. *Wiley*, *supra*, 18 Cal.3d at p. 173, fn. omitted, italics added.)

What *Steger* and *Wiley* make clear is that any crime accompanied by torture has as an ingredient a special form of aggravation due to the mental state of the perpetrator. Just as "the concept of torture has meaning independent of its role in causing death" (*People* v. *Davenport*, *supra*, 41 Cal.3d at pp. 268-269), it has meaning independent of its role in causing great bodily injury. By approving Proposition 115, the electorate exercised its prerogative to make criminal and punish separately the act of torture when it is committed in conjunction with any one of those acts listed in section 206. (See, e.g., *Davenport*, *supra*, 41 Cal.3d at pp. 268-269.)

Barrera's analogies to aggravated battery, assault, and attempted second-degree murder with great bodily injury are imperfect. Extortion by means of torture is different and more serious than extortion or extortion coupled with any enhancement. Again, the power lies with the legislative branch or the

electorate to enumerate other independent acts such as battery, assault, and attempted murder within the torture statute.

A review of the statutes of California shows no crimes more serious than torture that are punished less severely. In fact, in comparing the life term for torture to other crimes involving a life sentence interesting facts are discovered. Train wrecking, carrying a sentence of life without possibility of parole, does not involve great bodily injury or an intent to inflict pain. (§ 218.) Kidnapping for extortion also carries a term of life without possibility of parole if death *or* bodily harm results. (§ 209, subd. (a), italics added.) Mere kidnapping to commit robbery, on the other hand, where no bodily injury occurs, carries a life sentence. (§ 209, subd. (b).) Attempted first degree murder with a finding of premeditation and deliberation also carries a life sentence. (§§ 664/189.)

Barrera's argument the section is cruel and/or unusual based upon other punishments for less serious crimes within this jurisdiction therefore fails.

### (4) *Comparison With Punishment for the Same Crime Outside This Jurisdiction*

Barrera claims great difficulty in comparing the punishment for torture in California with that in other jurisdictions due to the calculation of credits and methods used to calculate parole dates.[8] However, asserting there is no crime of torture, per se, in other jurisdictions, he returns to his comparison to aggravated assault and the punishment for that offense in other jurisdictions. As the previous discussion illustrates, this analogy or comparison is incorrect. (6c) Our review of the statutes of the various states reveals torture is not a separately punished crime in any state but California. Therefore, this last part of the cruel or unusual punishment test cannot be assessed. Significantly, Barrera has provided no authority to show that an inability to compare California law with that of other jurisdictions violates any state or federal constitutional provision or, alone, requires reversal. If this were the case, a new crime, as the electorate intended, could never be created.

---

[8]At oral argument, counsel for defendant urged we abandon this portion of the cruel or unusual punishment analysis due to this difficulty and the costs involved. Assuming the issue is properly before us, having been raised for the first time at oral argument, we reject his suggestion as we are bound to follow the analytical approach set forth by our Supreme Court. (See *Auto Equity Sales, Inc.* v. *Superior Court* (1962) 57 Cal.2d 450 [20 Cal.Rptr. 321, 369 P.2d 937].)

## IV

### *CALJIC No. 9.90 Properly Sets Forth the Elements of Torture*

■ According to Barrera, CALJIC No. 9.90 does not properly set forth the elements of section 206 and merely restates the language of *Tubby* and *Wiley*. He argues the elements of intent and great bodily injury should be defined in the same manner they are defined in section 12022.7.[9]

Barrera continues his argument by urging there should be three elements to the crime of torture, not two: "First, the defendant inflicted great bodily injury on the victim. Second, this was done with the intent to cause cruel or extreme pain. Third, the purpose or motive of this act was for revenge, extortion, persuasion, or for any sadistic purpose."

CALJIC No. 9.90 provides:

"[Defendant is accused in [Count[s] _____ of] the information of having committed the crime of torture, a violation of Penal Code Section 206.]

"Every person who, with the intent to cause cruel or extreme pain and suffering for the purpose of revenge, extortion, persuasion, or for any sadistic purpose, inflicts great bodily injury upon the person of another, is guilty of the crime of torture in violation of Section 206 of the Penal Code.

"Great bodily injury means a significant or substantial physical injury.

"[The crime of torture does not require any proof that [the perpetrator intended to kill the other person] [or] [the person upon whom the injury was inflicted suffered pain].]

"In order to prove such crime, each of the following elements must be proved:

---

[9]Section 12022.7 provides:

"Any person who, with the intent to inflict such injury, personally inflicts great bodily injury on any person other than an accomplice in the commission or attempted commission of a felony shall, in addition and consecutive to the punishment prescribed for the felony or attempted felony of which he has been convicted, be punished by an additional term of three years, unless infliction of great bodily injury is an element of the offense of which he is convicted.

"As used in this section, great bodily injury means a significant or substantial physical injury.

"This section shall not apply to murder or manslaughter or a violation of Section 451 or 452. The additional term provided in this section shall not be imposed unless the fact of great bodily injury is charged in the accusatory pleading and admitted or found to be true by the trier of fact."

"1. A person inflicted great bodily injury upon the person of another; and

"2. The person inflicting the injury did so with specific intent to cause cruel or extreme pain and suffering [for the purpose of [revenge] [,] [extortion] [,] [persuasion] [,] [or] [for any sadistic purpose].]"

Defendant is correct that the instruction utilizes language from long-standing Supreme Court precedent, as does section 206 itself. But, as the discussion in part I demonstrates, the definition of torture relied upon common usage and California Supreme Court case law dating back to the 1940's. The terms used in section 206, and therefore in CALJIC No. 9.90, are of such common usage that they are presumed to be within the understanding of reasonable jurors. (*People* v. *Raley, supra,* 2 Cal.4th at p. 901.)

Further, CALJIC No. 8.24, using similar language to that in CALJIC No. 9.90 when instructing on murder by torture, has been consistently approved as a correct statement of law and does not break down the elements in the manner defendant urges. (*People* v. *Raley, supra,* 2 Cal.4th at pp. 899-902.)

Barrera contends the jury was confused by the instruction that it find special intent to cause "cruel or extreme pain and suffering." However, he provides no evidence of actual confusion, nor do we find any in the record. (See *People* v. *Dougherty* (1982) 138 Cal.App.3d 278, 282-283 [188 Cal.Rptr. 123].)

Barrera's claims of error regarding the instruction are therefore rejected.

V

*Other Statutes Do Not Specifically Cover the Same Conduct Section 206 Prohibits*

 Barrera contends prosecution under section 206 is prohibited because other statutes more specifically cover the same criminal acts; consequently, the greater penalty contained in section 206.1 is prohibited. He looks to extortion with great bodily injury (§§ 518, 12022.7), battery with serious bodily injury (§ 243, subd. (d)), and robbery in an inhabited dwelling with great bodily injury (§§ 212.5, 12022.7).

 As recently explained:

"The general rule is that where a specific or special statute covers much of the same ground as a more general statute so that a violation of the specific

statute will necessarily result in a violation of the more general statute, prosecution under the general statute will be precluded. (*People* v. *Jenkins* (1980) 28 Cal.3d 494, 505 [170 Cal.Rptr. 1, 620 P.2d 587]; see also *In re Williamson* (1954) 43 Cal.2d 651, 654 [276 P.2d 593].) It is only when each element of the 'general' statute corresponds to an element on the face of the 'special' statute or when it appears from the context a violation of the 'special' statute will necessarily or commonly result in a violation of the 'general' statute, that a prosecution under the 'general' statute is precluded. Moreover, as the *Jenkins* court noted, the rule is 'designed to ascertain and carry out legislative intent.' (28 Cal.3d at p. 505.) Where it is evident the Legislature did not intend to preclude application of the general statute, the rule does not apply." (*People* v. *Glenos* (1992) 7 Cal.App.4th 1201, 1209 [10 Cal.Rptr.2d 363].)

The offenses to which Barrera directs us are distinct from section 206. Assault with a deadly weapon and battery with serious bodily injury are general intent crimes. Torture, under section 206, is a specific intent offense. Extortion and residential robbery are specific intent offenses but, unlike torture, may be committed without the physical injury to the victim torture requires. Likewise, neither "great bodily injury" as defined in section 12022.7 nor "serious bodily injury" as defined in section 243, subdivision (d) require any showing of infliction of cruelty or extreme pain and suffering to achieve a particular end.

If we look at the crime of aggravated mayhem (§ 205) we find it too is different from the crime of torture. The victim must suffer "permanent disability or disfigurement" or deprivation of a "limb, organ, or member of his or her body." Of course, these injuries to the victim might also result from a robbery or extortion coupled with great bodily injury. Once more, however, it is the injury to the victim in conjunction with the mental state of the perpetrator that distinguishes mayhem from these other crimes.

What becomes clear in the comparison of these crimes is that none of them cover the specific crime of torture. As defined, the crime of torture fills a gap in existing law dealing with extremely violent and callous criminal conduct, and section 206.1 provides a specific punishment for that conduct. Section 206 is the electorate's response to a particular type of violence animated by a discrete and especially reprehensible intent.

Nothing in Proposition 115 or its ballot arguments suggests the electorate intended to limit its application to the *Singleton* facts or preclude its use where other crimes may be alternatively charged. The express intent was to create a new crime because of the perception that no existing offense adequately described or punished torture not resulting in death of the victim.

## VI

### Sentencing Error

#### (1) *The Court Failed to State Reasons for Imposition of the Upper Term When Sentencing Defendant on the Gun Use Enhancement*

██ Defendant argues the court erred by failing to state reasons for imposing the upper term of five years on the firearm enhancement (§ 12022.5). According to defendant, the record does not demonstrate the court was aware it was exercising a sentencing choice when imposing this term.

Section 12022.5, subdivision (a) provides:

"(a) Except as provided in subdivisions (b) and (c), any person who personally uses a firearm in the commission or attempted commission of a felony shall, upon conviction of such felony or attempted felony, in addition and consecutive to the punishment prescribed for the felony or attempted felony of which he or she has been convicted, be punished by an additional term of imprisonment in the state prison for three, four, or five years, unless use of a firearm is an element of the offense of which he or she was convicted. *The court shall order imposition of the middle term unless there are circumstances in aggravation or mitigation. The court shall state its reasons for its enhancement choice on the record at the time of sentencing."* (Italics added.)

The Attorney General does not contend reasons were stated, but instead argues that the error was harmless because the record shows a different result would not occur upon remand. (See *People* v. *May* (1990) 221 Cal.App.3d 836 [270 Cal.Rptr. 690].)

California Rules of Court, rule 428(b) provides:

"(b) When the defendant is subject to an enhancement that was charged and found true for which three possible terms are specified by statute, the middle term shall be imposed unless there are circumstances in aggravation or mitigation or unless, under statutory discretion, the judge strikes the additional term for the enhancement.

"*The upper term may be imposed for an enhancement only when there are circumstances in aggravation that relate directly to the fact giving rise to the enhancement.* The lower term may be imposed based upon any of the circumstances in mitigation enumerated in these rules or, under rule 408, any other reasonable circumstances in mitigation that are present." (Italics added.)

The report of the probation officer recommended the upper term on the gun use enhancement because defendant was more than armed: he "deliberately shot" his victim in the leg.

The court stated "circumstances" in aggravation "certainly outweighs [*sic*] all the circumstances in mitigation, how the events transpired."

However, this comment, relied upon by the Attorney General as evidence any error was harmless, appears to be directed to what the court intended to happen in the event section 206 was found to be unconstitutional on appeal. To add further ambiguity, the court appears to have been talking about the term it would be imposing on counts I and II, not the firearm use enhancement specifically.

Consequently, although factors in aggravation directly related to the firearm use may be present, on this record the matter must be remanded for resentencing so that the court has the opportunity to articulate the factors, if any, so related to the firearm use.

(2) *Imposition of a Term of 15 Years to Life.*

Defendant last argues the abstract of judgment incorrectly reflects imposition of a term of 15 years to life on the torture conviction. The Attorney General agrees, and so do we. The court imposed a life term.

Because we remand for resentencing on the enhancement, the trial court is directed to correct the abstract of judgment at the time of resentencing and to provide copies to the appropriate authorities.

### DISPOSITION

The judgment of conviction is affirmed. The judgment insofar as it relates to sentencing is vacated, and the matter is remanded for resentencing in accordance with the views expressed herein.

Best, P. J., and Dibiaso, J., concurred.

A petition for a rehearing was denied April 28, 1993, and appellant's petition for review by the Supreme Court was denied July 15, 1993. Mosk, J., was of the opinion that the petition should be granted.