Filed 6/30/23  P. v Guzman CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>ANTONIO GUZMAN,<br><br>Defendant and Appellant. | F085660<br><br>(Merced Super. Ct. No. CRM027614)<br><br>**OPINION** |

### THE COURT*

APPEAL from an order of the Superior Court of Merced County.  John D. Kirihara, Judge.  (Retired Judge of the Merced Super. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.)

Randy S. Kravis, under appointment by the Court of Appeal, for Defendant and Appellant.

Office of the Attorney General, Sacramento, California, for Plaintiff and Respondent.

-ooOoo-

---

\* Before Levy, Acting P. J., Detjen, J. and Franson, J.

## INTRODUCTION

In 2014, appellant and defendant Antonio Guzman (defendant) was convicted after a jury trial of first degree murder with an enhancement that he personally used a deadly and dangerous weapon, and sentenced to 25 years to life plus one year imprisonment.

In 2022, defendant filed a petition for resentencing pursuant to Penal Code section 1172.6[1] and alleged he was convicted of murder based on imputed malice. The trial court appointed counsel, conducted a hearing, and found he was ineligible for resentencing as a matter of law.

On appeal, appellate counsel filed a brief which summarized the facts and procedural history with citations to the record, raised no issues, and asked this court to independently review the record pursuant to both *People v. Delgadillo* (2022) 14 Cal.5th 216 (*Delgadillo*) and *People v. Wende* (1979) 25 Cal.3d 436. Defendant submitted his own letter brief and requested this court address certain issues.

We will address defendant's contentions and affirm.

## FACTS[2]

As of April 28, 2013, Christyn Aguilar resided in a house on Valencia Way in Atwater, with her mother, Bonnie Aguilar; other family members; and Andrew Sanchez.

---

[1] All further statutory citations are to the Penal Code unless otherwise indicated. Defendant filed his petition in 2022 pursuant to section 1170.95. As will be discussed below, the statute was substantively amended effective January 1, 2022, and renumbered as section 1172.6 without further change on June 30, 2022. (*People v. Saibu* (2022) 81 Cal.App.5th 709, 715, fn. 3.) As such, we refer to the subject statute by its current number throughout this opinion, except where otherwise indicated.

[2] On April 19, 2023, this court granted defendant's motion to take judicial notice of the record and nonpublished opinion in his direct appeal, *People v. Guzman* (Apr. 22, 2016, F069165). The facts and procedural history are taken from these records.

In reviewing a section 1172.6 petition, the court may rely on "the procedural history of the case recited in any prior appellate opinion." (§ 1172.6, subd. (d)(3); *People v. Clements* (2022) 75 Cal.App.5th 276, 292; *People v. Cooper* (2022) 77 Cal.App.5th 393, 406, fn. 9.) The role of the appellate opinion is limited, however, and the court may not rely on factual summaries contained in prior appellate decisions or engage in fact finding at the prima facie stage. (*People v. Clements, supra,* 75 Cal.App.5th at p. 292;

2.

Christyn's boyfriend, Carlos Belmonte, stayed there occasionally, as did Joseph McDonald, who had been living in a detached garage since sometime in 2012.

On April 28, McDonald began drinking beer around 10:00 a.m. or possibly a bit earlier. He continued drinking into the afternoon, when other people started to arrive at the house for a barbecue. Rachel Sanchez, Andrew's mother, arrived about 11:00 a.m. Defendant, Andrew's coworker, arrived around noon in his red or burgundy truck, then remained outside with Bonnie, Andrew, and McDonald. All were drinking. As far as Christyn could tell as she went back and forth in and out of the house, everything was peaceful and calm.

According to Bonnie, there was a running argument between defendant and McDonald concerning defendant's boots. Over the course of several hours, the argument flared up, died down, and then flared up again a number of times. At some point, McDonald put his hands on Bonnie in a disrespectful manner. He kept touching her and she kept pushing him away, then finally defendant stepped in and was able to get McDonald to stop touching her. Defendant told McDonald multiple times, "Don't bite the hand that feeds you." Defendant did not raise his voice. According to Rachel, however, Bonnie was intoxicated and was hitting and antagonizing McDonald, and trying to get defendant to beat McDonald up. She kept whispering in defendant's ear, then took him in a room for 30 minutes. This was about 1:00 p.m. When defendant came out, he had an attitude toward McDonald.

Between 4:00 and 4:30 p.m., Belmonte was getting ready to start the grill for the barbecue. Bonnie, defendant, McDonald, and Andrew were sitting near the grill. All were drinking beer. Defendant and McDonald were sitting about three or four feet apart.

---

*People v. Lewis* (2021) 11 Cal.5th 952, 972 (*Lewis*).) We have recited the factual statement from defendant's direct appeal to place his arguments in context, and will not rely on that factual statement to resolve his appeal from the trial court's order that found his petition did not state a prima facie case for relief.

3.

When Belmonte first saw them, they seemed to be conversing. Within about 30 seconds, however, they started arguing. McDonald's voice was raised, and he acted as if he was angry. Defendant's voice was not raised, but it appeared, from the look on his face, that he was starting to get mad.

The argument lasted no more than a minute, with McDonald doing most of the talking. At some point, McDonald got out of his chair and walked toward defendant, who was still seated. Standing over defendant, McDonald told him, "If you have a problem, say it to my face and we'll take it to the back." Defendant then stood up. McDonald was still angry, while defendant still appeared calm.

According to Rachel, McDonald got up when Bonnie slapped him. McDonald said that was enough, then defendant said something to him and pointed his finger in McDonald's face. McDonald responded, "No man points his finger in my face," and "Let's take it around the corner." Defendant got angry.

Belmonte recalled McDonald and defendant walking down the driveway toward the back of the house. Belmonte followed them, because he thought they were "going to go toe-to-toe." He believed McDonald was drunk. McDonald started walking first, and passed defendant's truck. Defendant went to the driver's side of his truck. He opened the door, leaned inside, and appeared to be looking for something. He emerged a few seconds later and ran at McDonald. A white plastic sheath went flying from defendant's vicinity. Defendant had to run about 15 feet to reach McDonald, who was standing with his fists clenched about the level of his waist, like he was ready to fight. McDonald did not have anything in his hands.

Defendant started swinging a machete at McDonald in an up-and-down manner. The first blow—a powerful swing—struck the right side of McDonald's neck. McDonald brought his arms up to try to defend himself, but defendant continued to swing the weapon. At least some of the blows made contact with McDonald's body. Three to four of the swings were to McDonald's left side, like defendant was trying to get the left

4.

side of McDonald's neck. The swings were too fast for Belmonte to count, but there were more than four. They were constant, fluid motions, with no pauses in between.

Rachel recalled McDonald and defendant walking toward the backyard at the same time. Rachel was walking with McDonald and trying to calm him down. Defendant, who was slightly ahead of them, went straight to his truck and reached in the passenger side. Rachel saw defendant get something out of his truck, then saw the machete strike McDonald's face. Although McDonald had squared off with his hands up to fight, he did not push or strike defendant, or make any type of aggressive hand movement. Nevertheless, defendant went straight to the truck, then kind of ran at McDonald and struck him in the face with the machete. Defendant then "persistently" swung the machete at McDonald's upper body. McDonald had nothing in his hands and did not land any blows. Rachel believed defendant swung at least eight or nine times. Before the first blow, McDonald said to defendant, "It's like that, huh?" Defendant said nothing. During the attack, McDonald kept telling Rachel to run, but she could not, because defendant pointed the machete at her and told her not to move.

McDonald was bleeding profusely, with blood squirting from his neck. Defendant backed away from him, then quickly went toward the back of the house and tossed the machete inside the attached garage. According to Belmonte, defendant had a blank expression on his face. Belmonte did not hear him say anything. Belmonte heard Christyn start to come outside, and he told her to go back in and call 911. Defendant ran to his truck and drove away. Belmonte did not "believe that he burned rubber, but he left pretty quickly." They made eye contact for a couple of seconds. Defendant looked angry.

According to Rachel, after defendant ran toward the back of the house, he came up to her, looking confused and terrified, like he was in shock. He asked what he did, and she pointed at McDonald. Defendant looked at McDonald and then back at Rachel, and he told her to shut her mouth and not say anything. He then left quickly in his truck.

5.

McDonald asked Rachel for help. He hugged her, asked what happened and who did it, and whether he (McDonald) was wrong.

Atwater Police Officer Dasilva was dispatched to the residence at approximately 5:16 p.m. and arrived shortly after. He located a bloody machete in the garage. He received information as to two possible locations the suspect might be found. When he responded to the second one—a trailer park on Crest Road—he was informed by a neighbor that the trailer in question was occupied by an 11-year-old boy. The boy's mother was contacted and gave permission to enter.

Both doors to the trailer were locked. Dasilva knocked, but there was no response, so he kicked in the main door. He and Corporal Echevarria searched one side of the trailer, while Detective Richards and Officer Torres searched the other. Shortly after entry, Dasilva heard Torres yelling, "Show me your hands." Dasilva immediately proceeded to Torres's location in the west bedroom. There, Dasilva observed defendant and a boy lying on the bed, under the covers. Torres continued to give commands, but defendant did not comply with them. He had his hands concealed and the boy was a potential hostage, so Dasilva used his Taser on defendant. Defendant was then taken into custody. Richards did not smell any alcohol in the room, which was very small, and he did not observe any objective signs defendant was intoxicated.

The autopsy revealed McDonald sustained 14 chopped and incised wounds from a sharp-edged object. One wound, which involved the lower side of the face from the jaw to behind the ear, was a little more than six inches long and gaped open about one and a half inches. It severed one of the jugular veins on the right side of the neck. There were also chop injuries to the forearms and palm side of the hands and fingers. Some were quite deep. They were defensive injuries. At some point, McDonald tried to save himself by grabbing the blade. The cause of death was chopped and incised wounds of the head, neck, and arms. McDonald's blood tested negative for drugs, but his blood-alcohol level was 0.245 percent.

6.

**Defense Evidence**

Defendant testified that on the morning of April 28, he was with his family at home in the Crest Road trailer park. He telephoned Andrew, who was going to loan him $100. They met outside Bonnie's house at around 10:45 a.m., then defendant drove Andrew to a liquor store where Andrew could cash his check. At the store, Andrew cashed his check, gave defendant the loan, and bought some beer. They returned to Bonnie's house just before noon.

Defendant parked in the driveway, then he and Andrew moved to the front part of the house near the garage. There were a patio and chairs, and Bonnie, Belmonte, and Rachel were present. Defendant did not recall McDonald being there at that time. They all sat together, drinking beer, and talking for about an hour. There was no arguing that defendant could recall.

Prior to this date, defendant did not really know McDonald, although he had seen McDonald when he (defendant) went to the house to see Andrew. On April 28, defendant saw McDonald walking back and forth between the back garage and defendant's truck, then he came over and "started to be aggressive." McDonald told Bonnie she was "a bitch," and Bonnie told him to stop "talking shit." Defendant tried to calm them down so the situation would not get worse. In a normal voice, he said McDonald should not treat Bonnie like that, because she was renting to him and giving him food. Defendant did not say this directly to McDonald, however.

At some point, Bonnie and defendant went inside the house. Bonnie said McDonald was being aggressive "maybe because he was drinking," and that he had tried to hit her. She told defendant to be careful.

Defendant returned to the patio area and sat back down. He tried to ignore McDonald because he was afraid and did not want problems. Referring to defendant's boots, McDonald said he could make much better boots in prison, because those were just

7.

Mexican boots.  McDonald, who was standing in front of defendant, tried to grab defendant's foot.

Defendant rose and told Andrew and McDonald that he did not want problems and was leaving.  McDonald followed him and called him names, like he wanted to fight.  Defendant was headed to his truck, and he tried to walk faster because he could hear McDonald behind him, telling him to stop and asking if defendant wanted to fight with him.

When defendant reached his truck, he tried to ignore McDonald.  He opened the passenger door for a few seconds to see if McDonald would just walk on by.  He closed the door when he realized McDonald was right behind him.  McDonald said defendant was a "pussy" and struck him in the arm.  Defendant fell against the side of the truck.  McDonald then came up and said, "This is where I'm going to kill you."

Terrified, defendant grabbed the machete that was lying in the bed of his truck and tried to defend himself from McDonald's blows.  Defendant was backing up, but McDonald kept hitting him.  At some point, the cover came off the machete.  Defendant recalled swinging the machete to defend himself.  McDonald was cut when defendant was trying to block his blows.  Everything happened very quickly.  When defendant was swinging the machete at McDonald, he felt "terrible fear" and his legs were shaking.  Defendant actually thought he might die.  He remembered McDonald trying to grab the machete.

When McDonald stopped hitting him, defendant ran away.  He went to the garage and put the machete with his tools.  He then went home.  He went in his room and tried to calm down.  When the police came, he did not try to hide.  They did things to scare defendant's son, however, so defendant waited with the boy while they came in.

Between the time he arrived at Bonnie's house to the time of the incident with McDonald, defendant consumed approximately six beers.  He thought he "[p]ossibly" was feeling some effects from the alcohol, and he was not thinking clearly because he

8.

was so afraid.  Defendant did not consider himself an aggressive person; he had never been in a fist fight before.

Griselda Lopez, who had known defendant approximately eight or nine years and had two children with him, testified she had never heard anyone say defendant was violent or acted aggressively when drinking.  In her opinion, he was a calm, peaceful person.

Vivian McDonald, McDonald's ex-wife, testified concerning a physical altercation that occurred between her and McDonald on June 17, 2010.

## PROCEDURAL BACKGROUND

On June 19, 2013, an information was filed in the Superior Court of Merced County charging defendant with count 1, murder of McDonald (§ 187, subd. (a)), with an enhancement for personally using a deadly and dangerous weapon, a machete, in the commission of the offense (§ 12022, subd. (b)(1)).

**The Instructions**

The court gave the jury CALCRIM No. 520 on the elements of murder, defining express and implied malice, and if the jury convicted defendant of murder, the offense was second degree murder.

The court also gave CALCRIM No. 521 to define first degree murder:

> "The defendant is guilty of first degree murder if the People have proved that he acted willfully, deliberately, and with premeditation.  The defendant acted willfully if he intended to kill.  The defendant acted deliberately if he carefully weighed the considerations for and against his choice and knowing the consequences, decided to kill.  The defendant acted with premeditation if he decided to kill before completing the act that caused death."

The jury was not instructed on any other theory of first degree murder.

The jury was further instructed on the lesser offense of voluntary manslaughter based on imperfect self-defense or sudden quarrel/heat of passion, justifiable homicide and lawful self-defense, and voluntary intoxication and specific intent.

9.

**Verdict and Sentence**

On January 29, 2014, after a jury trial, defendant was convicted of first degree murder, and the jury found true the allegation that he personally used a deadly and dangerous weapon.

On March 27, 2014, the court sentenced defendant to 25 years to life for first degree murder plus one year for the personal use enhancement.

**Direct Appeal**

On April 22, 2016, this court filed the nonpublished opinion that affirmed the judgment in defendant's direct appeal. We rejected defendant's arguments and held there was substantial evidence of first degree murder, the trial court did not erroneously instruct on flight, and defendant failed to establish ineffective assistance of counsel. (*People v. Guzman, supra*, F069165.)

## PETITION FOR RESENTENCING

On June 1, 2022, defendant filed a petition, in pro. per. for resentencing of his murder conviction and requested appointment of counsel.

Defendant's supporting declaration consisted of a preprinted form where he checked boxes that stated (1) a complaint, information, or indictment was filed against him that allowed the prosecution to proceed under a theory of felony murder, murder under the natural and probable consequences doctrine or other theory under which malice is imputed to a person based solely on that person's participation in a crime, or attempted murder the natural and probable consequences doctrine; (2) he was convicted of murder, attempted murder, or manslaughter following a trial, or accepted a plea offer in lieu of a trial at which he could have been convicted of murder or attempted murder; and (3) he could not presently be convicted of murder or attempted murder because of changes made to sections 188 and 189, effective January 1, 2019.

On June 3, 2022, the court appointed counsel to represent defendant and provided for additional briefing.

10.

**The People's Opposition**

On July 12 and November 17, 2022, the People filed opposition, and argued defendant was not eligible for resentencing because the jury was not instructed on felony murder or the natural and probable consequences doctrine, and he was convicted as the actual killer. The People filed the entirety of the jury instructions and the verdict forms from defendant's jury trial in support of the opposition.

**The Court's Hearing and Denial of the Petition**

On January 27, 2023, the court held a hearing on defendant's petition. Defendant agreed to appear via teleconference, and his attorney was in the courtroom. The prosecutor stated defendant was ineligible for resentencing because he was convicted of first degree premeditated murder as the actual killer, and the jury was not instructed on the felony-murder rule or the natural and probable consequences doctrine. The court agreed and invited argument from defendant's attorney. Counsel stated he had nothing to add and encouraged defendant to continue his progress in prison to improve his chances of receiving parole. The court denied the petition.

On January 31, 2023, defendant filed a timely notice of appeal.

## DISCUSSION

### I. Delgadillo/Wende

In *Delgadillo*, the court held a *Wende* analysis is not applicable to a trial court's order that denies a petition for postconviction relief under section 1172.6. (*Delgadillo, supra*, 14 Cal.5th at p. 222.) *Delgadillo* held that instead of using the process outlined in *Wende*, appointed counsel and the appellate court should do the following: "When appointed counsel finds no arguable issues to be pursued on appeal: (1) counsel should file a brief informing the court of that determination, including a concise recitation of the facts bearing on the denial of the petition; and (2) the court should send, with a copy of counsel's brief, notice to the defendant, informing the defendant of the right to file a

11.

supplemental letter or brief and that if no letter or brief is filed within 30 days, the court may dismiss the matter." (*Id*. at pp. 231–232.)

"If the defendant subsequently files a supplemental brief or letter, the Court of Appeal is required to evaluate the specific arguments presented in that brief and to issue a written opinion…." (*Delgadillo, supra*, 14 Cal.5th at p. 232.)

As noted above, appellate counsel filed a brief with this court pursuant to *Delgadillo* and *Wende*. The brief also included counsel's declaration that defendant was advised he could file his own brief with this court. This court sent defendant an order that, pursuant to *Delgadillo*, the appeal would be dismissed as abandoned if he failed to submit a letter brief within 30 days. On June 14, 2023, defendant filed a supplemental brief with this court in response to our *Delgadillo* order, raising specific issues.

## II. The Court's Order Denying the Petition

We first note that the court complied with section 1172.6 by appointing counsel, ordering further briefing, conducting a hearing on the petition, and giving reasons for finding defendant's petition did not state a prima facie case and he was ineligible as a matter of law. (§1172.6, subds. (b), (c).)

The prima facie inquiry under section 1172.6, subdivision (c) is "limited." (*Lewis, supra*, 11 Cal.5th at p. 971.) The court " ' "takes petitioner's factual allegations as true and makes a preliminary assessment regarding whether the petitioner would be entitled to relief if his or her factual allegations were proved. If so, the court must issue an order to show cause." ' [Citation.] '[A] court should not reject the petitioner's factual allegations on credibility grounds without first conducting an evidentiary hearing.' [Citation.] 'However, if the record, including the court's own documents, "contain[s] facts refuting the allegations made in the petition," then "the court is justified in making a credibility determination adverse to the petitioner." ' " (*Ibid.*)

The court may review the record of conviction that allows it "to distinguish petitions with potential merit from those that are clearly meritless. This is consistent with

the statute's overall purpose: to ensure that … culpability is commensurate with a person's actions, while also ensuring that clearly meritless petitions can be efficiently addressed as part of a single-step prima facie review process." (*Lewis, supra,* 11 Cal.5th at pp. 971–972 & fn. 6.)

The jury instructions are part of the record of conviction and may be reviewed to make the prima facie determination. (*People v. Williams* (2022) 86 Cal.App.5th 1244, 1251–1252; *People v. Offley* (2020) 48 Cal.App.5th 588, 599; *People v. Harden* (2022) 81 Cal.App.5th 45, 59–60.)

As set forth above, defendant was the only person charged in the information with murder. The jury convicted defendant of first degree murder, and it was instructed on only one theory to find defendant guilty of first degree murder—that he acted willfully "if he intended to kill," he acted deliberately "if he carefully weighed the considerations for and against his choice and knowing the consequences, decided to kill," and he acted with premeditation if he "decided to kill before completing the act that caused death." The jury was not instructed on principals and aiders and abettors, felony murder, natural and probable consequences, conspiracy, target and nontarget offenses, or any theories of imputed malice.

The record of conviction thus establishes that defendant was convicted as the actual killer who acted with the intent to kill, his conviction was not based on any theory of imputed malice, and the court correctly denied his petition without issuing an order to show cause and found he failed to state a prima facie case for resentencing because he was ineligible as a matter of law.

### III.    Defendant's Contentions

In his supplemental brief, defendant argues that while the provisions of section 1172.6 are "clear," the statute is not constitutional and violates both due process and equal protection. Defendant's arguments are based on legally erroneous premises.

First, defendant argues section 1172.6 violates "due process" because it only applies to some persons, and excludes others from resentencing, based on the nature of their convictions. When the Legislature reforms one area of the law, it is not required to reform other areas of the law. (*Kasler v. Lockyer* (2000) 23 Cal.4th 472, 488.) "[B]oth the United States Supreme Court and this court have recognized the propriety of a legislature's taking reform ' "one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind." ' " (*Ibid.*)

Section 1172.6 "is 'an act of lenity' that requires, under specified circumstances, reduction of the offense for which [the petitioner] was properly convicted…. No constitutional provision required the Legislature to authorize relief under the conditions specified" in section 1172.6. (*People v. James* (2021) 63 Cal.App.5th 604, 609.) In enacting Senate Bill Nos. 1437 (2017–2018 Reg. Sess.) and 775 (2020–2021 Reg. Sess.), the legislative focus was centered on convictions for murder, attempted murder, and manslaughter that were based on felony murder, the natural and probable consequences doctrine, or other theories of imputed malice, and created a special procedural mechanism for those convicted under the former law to seek retroactive relief under the amended law. (*People v. Harden, supra,* 81 Cal.App.5th at pp. 50–51; *People v. Birdsall* (2022) 77 Cal.App.5th 859, 865, fn. 18; *People v. Vizcarra* (2022) 84 Cal.App.5th 377, 388.)

The Legislature could rationally decide to change the law in this area and not address other crimes. (*Kasler v. Lockyer, supra*, 23 Cal.4th at p. 488.) It also could reasonably decide that when a petitioner is convicted of murder, attempted murder, or manslaughter based on a theory of imputed malice, the punishment for those offenses could be excessive and reform was only needed in those circumstances. (See, e.g., *Williams v. Illinois* (1970) 399 U.S. 235, 241 ["A State has wide latitude in fixing the punishment for state crimes"].) The Legislature's decision to exclude an actual killer who acted with the specific intent to kill falls within its "line-drawing" authority as a rational choice that is not constitutionally prohibited. (*People v. Sanchez* (2020)

14.

48 Cal.App.5th 914, 921; see also *Johnson v. Department of Justice* (2015) 60 Cal.4th 871, 887 [A classification is not arbitrary or irrational simply because it is underinclusive].)

Next, defendant makes a similar argument but under a different constitutional theory and argues section 1172.6 violates equal protection because the statute treats similarly situated people in different ways. In raising an equal protection challenge, "only those persons who are similarly situated are protected from invidiously disparate treatment." (*People v. Barrera* (1993) 14 Cal.App.4th 1555, 1565.) "Generally, offenders who commit different crimes are not similarly situated" for equal protection purposes. (*People v. Morales* (2019) 33 Cal.App.5th 800, 808.)

When enacting the predecessor statute to section 1172.6, the Legislature explained the purpose was to " 'more equitably sentence offenders in accordance with their involvement in homicides.' " (*People v. Gentile* (2020) 10 Cal.5th 830, 838–839.) A petitioner convicted of murder is ineligible for resentencing, and the petition may be denied without issuing an order to show cause, if the record of conviction conclusively establishes, with no factfinding, weighing of evidence, or credibility determinations, that he was the actual killer. (*Lewis, supra*, 11 Cal.5th at p. 967; *People v. Gentile, supra,* 10 Cal.5th at p. 842; *People v. Lopez* (2022) 78 Cal.App.5th 1, 14–15.) Even if convicted under the felony-murder rule, the petitioner is ineligible for resentencing if he was the actual killer. (*Delgadillo, supra*, 14 Cal.5th at pp. 223, 233.) We thus reject defendant's equal protection claim. (See, e.g., *People v. Sanchez*, *supra*, 48 Cal.App.5th at pp. 920–921.)

Finally, defendant claims his constitutional right to substantive due process was violated by the trial court's denial of his petition without issuing an order to show cause and conducting an evidentiary hearing. When defendant filed his petition, however, the court fully complied with section 1172.6 by appointing counsel, providing for further briefing from both parties, conducting a hearing to determine whether defendant's

15.

petition stated a prima facie case for relief, and stating reasons why it was denying the petition and defendant was ineligible for resentencing as a matter of law. In denying the petition, the court did not make prohibited factual findings but instead expressly relied on the jury instructions and the verdict forms that the People filed in support of its opposition, that showed defendant was convicted of first degree premeditated murder as the actual killer who acted with the intent to kill, and the jury was not instructed on the felony murder rule, the natural and probable consequence doctrine, or any imputed malice theories. The court complied with defendant's statutory rights under section 1172.6.

## **DISPOSITION**

The court's order of January 27, 2023, denying defendant's petition for resentencing, is affirmed.