Filed 8/26/20  P. v. Young CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C087398 |
| Plaintiff and Respondent, | (Super. Ct. No. 13F07569) |
| v. | |
| ANDREW GOODRICH YOUNG, JR., | |
| Defendant and Appellant. | |

Over the course of two decades, defendant Andrew Goodrich Young, Jr., abused his position of trust as a father figure, an uncle, and a church leader when he committed similar sexual acts on three girls, K., B., and T.  In a prior case arising out of his molestation of B., defendant was convicted of committing a lewd and lascivious act on a child under the age of 14.  (Pen. Code, § 288, subd. (a).)[1]  This appeal arises out of

---

[1]    Undesignated statutory references are to the Penal Code.

1

defendant's convictions for molesting his third victim, T. Although the trial court in the current case dismissed the charges for offenses committed against his first victim, K., the prosecution was allowed to introduce evidence of sexual molestation of K. under Evidence Code section 1108. Thus, the remaining charges in the present case arise out of defendant's molestation of T.

Trial in this case culminated with the jury convicting defendant of one count of forcible lewd and lascivious act on a child under 14 years of age (Pen. Code, § 288, subd. (b)), and seven counts of lewd and lascivious acts on a child under 14 years of age (§ 288, subd. (a)). The jury also found true the allegation defendant had been previously convicted of a lewd and lascivious act on a child (§ 288, subd. (a)) within the meaning of sections 667, subdivision (a), and 667.61, subdivision (d)(1). The trial court sentenced defendant to serve a determinate term of 40 years plus an indeterminate term of 400 years to life in prison.

On appeal, defendant contends (1) the trial court erred in admitting propensity evidence under Evidence Code section 1108, (2) the admission of propensity evidence violated his federal due process rights, (3) his prison sentence of 440 years to life in prison constitutes cruel and unusual punishment under the California and federal constitutions, (4) the trial court abused its discretion when imposing consecutive sentences because the resulting life sentence exceeded his natural life span, and (5) this case must be remanded for resentencing under the trial court's newly granted discretion to strike the five-year enhancements imposed under section 667, subdivision (a).

We conclude the trial court did not abuse its discretion by admitting propensity evidence in the form of testimony by K. and B. that defendant molested them in a similar manner to his molestation of T. California courts have uniformly rejected due process challenges to the admission of propensity evidence under Evidence Code section 1108. Defendant's sentence does not run afoul of prohibitions on cruel and unusual punishment in the California and federal constitutions. We reject defendant's challenge to

2

consecutive sentences on a rationale that has not been adopted by California courts. Finally, we decline to remand this case where the trial court stated on the record that it would not have reduced defendant's sentence regardless of sentencing discretion. Accordingly, we affirm the judgment.

FACTUAL AND PROCEDURAL HISTORY

***Prosecution Evidence***

### 1. *Forcible and Nonforcible Lewd Acts Against T.*

T. met defendant when she was 10 or 11 years old. Defendant and T.'s aunt, Ta., were married or engaged to be married. Ta. had four children from a prior relationship. One of Ta.'s children, E., was the same age as T. T. and E. were very close friends.

When T. was 12 years old, she, E., and defendant were all lying in a backyard hammock together. T. testified, "We were all close and had a very open relationship with [defendant], and so we were comfortable doing that." E. joked about T.'s earlier "infatuation or admiration for [defendant] as an older adult . . . ." When they went into the house, defendant told T. "he was flattered by the fact that [T.] had feelings for him, and [T.] believe[d] that is the time when he disclosed that they were mutual . . . ."

T. had a Facebook account that sent notices of activity to her Gmail e-mail address. Defendant had a public Facebook account with the moniker, "Achilles the Pirate." After disclosing his feelings to T., defendant started a private Facebook account under the moniker, "El Dorko" to secretly discuss his feelings with T. Defendant sent her romantic messages that made her feel "special and admired and mature." Within a few weeks, the relationship became physical. Defendant sent her a message saying, "I love you when you pour your sugar on me." Defendant expressed his desire to kiss her in a "long and sexual" manner. He stated that both he and T. were "both hopeless romantics." Defendant apologized for "the difficulties" T. "might face loving him," which she understood to refer to the fact he was married to her aunt.

3

Defendant was aware T.'s mother would pick up T.'s brother on Wednesdays and therefore T.'s mother would routinely be out of the house for a substantial amount of time. One Wednesday, defendant called T. to say he had items to drop off at her house for T.'s mother. T. told him her mother would not be home until later that night. Defendant soon showed up at her house and sat down on the couch where T. was doing her homework. Defendant became forceful with her. T. testified: "He pushed me down on the couch, and I was obviously very alarmed because this was after the feelings were disclosed, so I was also confused as to why it was physical, but there was no, like, talk of actually meeting up and doing anything at that point, and he removed his clothes and tried – I guess you could say it was dry-humping, but couldn't get my clothes all the way off. My pants got stuck at my ankles." Defendant's penis was erect and the "dry-humping" was simulated intercourse without penetration. Defendant held her down with one hand while he took off his and her clothes. T. "was asking him what he was doing and kind of freaking out." T. struggled but did not feel she could fight back as he was holding her down. Defendant "kind of suddenly stopped, almost as if maybe he was feeling regretful . . . ."

Defendant left, only to return a half hour later. T. recounted that defendant said, "he was really sorry and he loved me, and it was because his feelings were growing stronger and that he couldn't overcome his urges and that me saying things would make things bad for me in the end." T. and defendant continued to talk over Facebook "as if things were normal . . . ." Defendant called her "lovely," "womanly," "mature," and "funny." T. considered those to be "everything I wanted to hear from somebody" because she was an insecure 12-year-old child.

T. wanted to continue the relationship without the sexual component. She did not tell anyone because she feared it would make defendant angry and no one would believe her. After the couch incident, T. and defendant communicated nearly every day. Defendant began professing his love for her. Defendant would be in her neighborhood

4

often and pick up T. in his truck. Approximately twice a week over the course of a year during which T. was less than 14 years old, defendant drove them to a private location where he would kiss her and touch her legs and breasts. The kisses were very passionate and defendant put his tongue into T.'s mouth. Defendant would touch her over and under her clothes. Although defendant was still married to T.'s aunt, he started calling T. his wife. Defendant made clear his desire to engage in sexual intercourse with T., which he called "puppy-making." Defendant often sent her messages such as: "You actually have an older man who is in love with you and you are in love with him. We have a mature adult level relationship."

Defendant bought a cell phone for T. and made her tell her mother that it had been given to her by a friend at school. Defendant bought her the phone to be able to communicate privately with T. Defendant paid for the ongoing costs of the cell phone. He would become mad or paranoid if T. did not promptly return his messages.

When T. was 12 or 13 years old, she was lying in a hammock with defendant and E. After E. dozed off, defendant grabbed T.'s hand and put it under his pants and onto his erect penis to give him a "hand job."

When T. was 13 years old, T. and defendant kissed. Defendant led her to her parents' bed. T. told him that she did not want to have sex. Defendant responded that they did not have to take their clothes off. Nonetheless, defendant removed her pants. T. testified: "I still had my underwear on and he removed his pants, I don't remember him removing his boxers, and grinded against me." She could not remember how long this persisted but stated, ". . . I do believe that he had finished because he was breathing very heavily and at some point kind of collapsed on top of me."

When T. was 13 or 14 years old, defendant and T. "drew back a little bit" from the relationship. About a year later, defendant and his family moved to Hawaii. When T. was 16 years old, she told her grandmother about her relationship with defendant. At her grandmother's urging, T. reported the molestations to the police.

Defendant's sister, S., testified that defendant sometimes referred to himself as Achilles the Disney Pirate and as El Dorko. In 2013, defendant called her and told her that T. "made some allegations against him and that she was upset because they moved to Hawaii and [E.] and her wouldn't have a connection any longer." Defendant also said "that he did do the Facebook, [and] that he did not try and rape her." In a subsequent conversation, defendant thanked S. for referring him to an attorney and that he felt better. He also stated, ". . . I am just sick about everything and I am sorry about this." Defendant also said he was "sorrowful."

## 2. *Investigation*

In March 2013, T. was 15 years old when interviewed by Sacramento Sheriff's Department Detective Janae Galovich. T. described how she communicated with defendant via Facebook using his El Dorko moniker. T. also recounted the incident on the couch during which defendant held her down. She told the detective that she kicked and screamed during that incident. T. reported there were many incidents of kissing and hugging in defendant's truck.

T. gave the police her laptop computer that was forensically analyzed. The forensic analysis did not yield any full Facebook or Gmail messages relating to T.'s e-mail address or defendant's El Dorko account. The laptop data, however, did indicate it had "artifacts" from both the e-mail address and Facebook account. The analysis did not include a query of the remote Gmail server, but only the laptop device. Detective Galovich contacted Facebook, which reported no documents related to defendant's El Dorko or T.'s account were available. T. confirmed she had deleted all of the messages on her laptop.

During trial, T. gave her e-mail password to a district attorney's office investigator who accessed approximately 15,000 e-mails stored on the remote server for her account. Thousands of e-mails were notifications from defendant's El Dorko account and contained the substance of the communication. The e-mails confirm defendant

6

consistently referred to himself as T.'s husband. Defendant messaged T., "Darling, I am your man.. all the special, private and most passionate parts are yours . . . all for you and all waiting for you when you so desire me." Defendant told her, "Consider us as joined . . . we call ourselves husband and wife for a reason, we are like one in my heart."

### 3. *Prior Acts Evidence: Victim K.*

In 1993 or 1994, K. was six or seven years old when she met defendant. Defendant and K.'s mother dated briefly before getting married. Defendant and his two daughters moved in. K. treated defendant like her father and called him "dad."

The first time when K. saw defendant do something sexually inappropriate was one day when defendant opened the blinds to the sliding glass door. K. and her sister were playing only a few feet away from the other side of the door. Defendant was nude, put a towel down on the floor, got on his knees, and masturbated in front of them. Later that night at dinner, defendant made K. feel like she had done something wrong. He instructed her not to tell her mother about the incident.

The next incident occurred during a stormy night when K. was scared and her mother was not home. K. was seven years old. K. asked if she could sleep in defendant's bed. K. was wearing a baggy shirt and underwear. Defendant assented and K. fell asleep in his bed. She testified, "I woke up to him on top of me trying to take off my underwear, and he kept saying my mom's name." Defendant took off his underwear and then put his hips and penis between her legs. Defendant got her underwear off and moved his penis on her "stomach and private parts." The next morning, K. noticed blood in her underwear. When her mother got home from working her night shift, K. told her about defendant's conduct. K.'s mother responded, "Don't ever say that again, he would never do that."

One night when K. was eight or nine years old, she could not get to sleep. She lay down on a pillow that defendant had on his lap. After a while, defendant moved the pillow and she felt his erect penis. K. got up and went back to her room.

7

Sometimes defendant would kiss K. and put his tongue into her mouth. She remembered he kissed her and put his tongue into her mouth while he was moving out of the house. K. was 12 years old when defendant moved out.

**4. *Prior Acts Evidence: Victim B.***

Before defendant and K.'s mother separated, they taught children's ministry at their church. K. got to know B., who was her age and in the same children's ministry class. When B. alleged inappropriate conduct with defendant, K. disclosed to her mother that defendant had also been sexually inappropriate with her.

B. testified she met defendant in church because defendant and her stepfather were "really good friends." B. saw defendant at church. Defendant and B.'s stepfather started a paintball ministry when B. was 12 or 13 years old. When B. developed friction in her relationship with her mother, defendant was asked to be a church counselor or mentor for her. Defendant would take her places and read the bible to her. B. felt like she had to go with defendant to comply with her parents' wishes. B. was 12 years old when the relationship with defendant changed "to something else" as defendant began to treat her inappropriately.

The first sexual incident occurred during a slumber party at defendant's house when B. was 12 years old. B. intended to sleep in the living room with defendant's two daughters. Defendant took her to his bed, removed B.'s clothes, and then took off his own clothes. Defendant touched and kissed her breasts and genitals, inserting his fingers into her vagina. He got on top of her and pressed his genitals against hers. B. rolled over and curled into the fetal position because she was too afraid to move. B. testified that defendant "told me that if I said anything, I would get in trouble and not see my family." She believed his threat.

Defendant would stay at B.'s house almost every Friday night to get ready for the paintball ministry. Defendant slept in the guest bedroom. When B. was 11 or 12 years old, defendant began telling her how beautiful she was. Defendant bought her gold and

diamond jewelry. On five occasions when he slept over, defendant sneaked into her bedroom. He then removed her clothes before kissing and touching B.'s breasts and vagina. B. recalled defendant "really tried to push having sex with me, tried to get me to get birth control. He said he would be willing to even use a condom, but he called it plastic wrap and he hated it, and he said he wanted to feel inside of me."

Also when B. was 12, defendant said he wanted to marry her but that she needed to keep it secret until she was 18 years old. B. actually believed she was going to marry defendant when she turned 18 years old, even though she did not love him. Defendant wrote romantic poems to her. In one poem, defendant wrote: "My desire for your love seems more than I can stand . . . ." In another poem, defendant stated: "The hope of a partner in this journey of life, . . . begins to unfold for the future my wife."

Defendant bought B. a pager to send her "I love you" messages. When a teacher confiscated the pager, defendant bought B. a cell phone. The cell phone was for exchanging secret text messages between defendant and B. The cell phone was taken away by B.'s seventh grade teacher and given to her mother. B.'s mother was furious when she learned it was used to secretly communicate with defendant. B. was relieved when her mother said B. could not have further contact with defendant. B. eventually moved out of her mother's house and into her father's in order to get away from defendant. Shortly after B. moved into her father's house, defendant contacted her father to ask to work on her father's ranch.

The relationship between B. and defendant lasted from the time she was 12 years old until she was 13 or 14 years old. When B. was 14 years old, she disclosed the molestations to her stepsister and father. For his offenses against B., defendant was convicted of committing a lewd and lascivious act on B. (§ 288, subd. (a).)

**5.** *Child Sexual Abuse Accommodation Syndrome*

The prosecution called Dr. Blake Carmichael, a clinical psychologist and supervisor at the UC Davis Children's Hospital to testify about child sexual abuse

9

accommodation syndrome (CSAAS). Dr. Carmichael testified that on the basis of 20 years' experience in working with sexually abused children there are some commonalities to their postabuse behaviors. Some of these commonalities are addressed as CSAAS to dispel incorrect preconceived notions that therapists and social workers might have about children who have been sexually abused.

Delayed disclosure by the victim is common. The majority of sexually abused children do not immediately disclose the molestations. Approximately 40 to 60 percent of children wait until after they turn 18 years of age to disclose their molestations.

Dr. Carmichael explained that the "vast majority of kids are sexually abused by people they know, trust, have an ongoing relationship with, and they often have a loving, affectionate relationship with their perpetrator" so that the abused children "might feel responsible for the negative outcome of telling." Young children also might not quite understand when behavior is inappropriate due to their age and inexperience. Abusers may also threaten the victims into not reporting the molestations. Research shows that the closer the preexisting relationship between the perpetrator and the victim, the longer it tends to take the victim to report the molestations. Victims of child sexual abuse may also tend to minimize or omit details of the abuse out of a sense of "guilt, shame, embarrassment, things of that nature."

The purpose of CSAAS is not to evaluate whether a particular individual has been the victim of child sexual abuse, but only to dispel misconceptions about postabuse victim behaviors. Moreover, each victim of child sexual abuse can react differently.

### *Defense Evidence*

Defendant testified on his own behalf as follows: At the time of trial, he was 53 years old and in a wheelchair due to a parachute accident in 1987 when he served in the Navy. In 1987, defendant left the Navy and moved to Grass Valley. In 1991 or 1992, defendant married K.'s mother. The relationship was strained and K. "was subject to

10

some very difficult things . . . because of the substance abuse and alcoholism of her mother."

In 1992, defendant joined a church. Defendant acknowledged he had been convicted of committing a lewd act against B. About the conviction, defendant testified: "I crossed the line. I messed up. I understand that." During a two-month period in 1999, defendant spent the night at B.'s residence approximately four to six times. Defendant "began to have a relationship with B[.]" Her parents asked defendant to counsel her. Defendant developed romantic feelings for B. "that were not platonic." Defendant provided B. with a pager and a cell phone to communicate with her. After B. accused defendant, her father gave the cell phone back to defendant. Defendant lied and stated he had not given the cell phone to B. Even though it was "a wake-up call" to defendant, he ended up giving the same cell phone back to B. Although B.'s parents instructed defendant to have no further contact with their daughter, defendant continued to communicate with her. Defendant acknowledged taking advantage of the troubles that B. was having in her life while she was 13 years old. Defendant testified that B. made "greater accusations than what I had claimed had happened."

Defendant separated from K.'s mother in 1998, and they divorced in 1999. Approximately six months after the divorce, K. made accusations that defendant had molested her. Defendant called K.'s accusations "absolutely not true."

In 2007, defendant started working as an air conditioning subcontractor for a construction company owned by Jason Knight. Defendant disclosed his conviction and showed Knight the related paperwork. As a consequence of the long hours he worked for Knight, defendant did not have the time to spend with T. as she claimed in her testimony. Due to his back injury, defendant would also have been unable to hold T. down as she claimed.

Defendant denied any kind of sexual interaction or inappropriate conduct toward T. Defendant denied ever having a Facebook account named "El Dorko" or "Achilles the

11

Pirate." Defendant did not send any of the messages from El Dorko or Achilles the Pirate to T. He also did not send any messages from a Gmail account associated with Achilles the Pirate to T.'s Gmail address. Defendant did set up a Facebook account under "Drew of Maui" and sent T. three or four messages. It was these messages to which defendant referred when discussing the charges against him with his sister, S. Defendant referred to T. as "quite the actress and [she] did a lot of publishing of YouTube stuff and did skits on occasional family get-togethers."

Knight testified he first became acquainted with defendant around 2008. When Knight started his construction company around 2008, he hired defendant as a subcontractor. Defendant disclosed his prior conviction to Knight. Knight frequently sent defendant into people's homes for repairs to their heating and air systems. Knight never received complaints about inappropriate behavior by defendant. Defendant never disappeared during the working hours in 2008 or 2009.

On cross-examination, Knight indicated he believed defendant's conviction had been for kissing a 15-year-old girl. Had he known the convictions were for digital penetration of a 13-year-old girl, Knight might have changed his opinion of defendant. Knight went scuba diving with defendant after defendant moved to Hawaii. Defendant used an 80-pound Nitrox tank and diving weights.

John Christopher Jacobsen testified he met defendant around 2008 working for Knight's construction company. Jacobsen had previously worked as a Sacramento County police officer for 11 years. While working together, defendant brought up his prior conviction. Jacobsen believed it occurred in the state of Washington for having sex with an underage minor. Jacobsen never heard any complaints from homeowners where defendant made repairs. On cross-examination, Jacobsen recalled that defendant said, "he had had sex with a . . . 16-year-old or 17-year-old, and that either the father or someone had issues with it and took it to the local municipality for" "adjudication."

12

Candace Young (Candace) testified that she is very close to defendant, her father. They have never kept secrets from each other. Growing up, she never observed defendant do anything sexually inappropriate with her or her sister. Candace also never observed anything inappropriate between defendant and T. during the family gatherings when they were together. Candace was aware of defendant's past conviction. Defendant told her the conviction arose out of kissing B. Defendant did not disclose anything else about the conduct leading to the conviction. Candace remembered defendant having El Dorko and Achilles the Pirate user names.

### *Rebuttal Evidence*

On rebuttal, the prosecution called Perry McKinnon as a witness. McKinnon had been defendant's friend since the mid-1990's. They went to the same church and participated in the paintball ministry together. In September 2000, McKinnon spoke to defendant about B.'s allegations against him. Defendant denied B.'s accusations. Even after his conviction, defendant continued to maintain his innocence. In 2006, defendant moved into McKinnon's house because defendant was divorcing his then-current wife, R. Defendant began an affair with McKinnon's wife, Ta. Defendant convinced Ta. to divorce McKinnon, and paid for the attorney who represented Ta. in the divorce proceedings. McKinnon and Ta. divorced in July 2007. Ta. and defendant were married a month after that. McKinnon testified that defendant "is a very good liar."

B.'s father, J., testified that he got to know defendant at church and considered him to be a good friend. J. and his wife asked defendant to mentor B. because she was "quite rebellious." The children at their church looked up to defendant. After B. disclosed the molestations, J. confronted defendant. Defendant denied the accusations. Defendant has never acknowledged his wrongdoing with B.

M. testified that she was best friends with Ta.'s daughter, B. M. visited Ta. and defendant's house when she was 15 to 17 years old. Defendant mentioned that "he was

13

going to hide a camera in the shower so that he could make money off of it." Defendant told her that "watching us girls in the shower would make money and it was a tough economy . . . ." M. regularly used the shower at that house. Defendant "referenced" the shower camera "many times." Although M. saw T. at the house when she was younger, defendant made the rule that T. could not come over anymore because M. and T. "talked to each other too much."

DISCUSSION

I

***Propensity Evidence***

Defendant contends the trial court abused its discretion by admitting evidence of prior sexual misconduct under Evidence Code sections 1108. Specifically, he argues his molestations of K. were too remote and dissimilar to the currently charged offenses to have probative value. He also argues the propensity evidence in the form of K.'s testimony was inherently prejudicial and should have been excluded under Evidence section 352.

We address the propensity evidence involving K. *and B.* for two reasons. First, in the trial court, the defense moved to exclude evidence relating to K. and B. as inadmissible propensity evidence. During trial, defense counsel objected on the basis of Evidence Code section 1108 only during B.'s testimony. The trial court and attorneys for the parties believed B.'s testimony was also being admitted to show propensity. Second, considering the propensity evidence in the form of B.'s testimony prevents the appearance of a long gap in defendant's molestations of girls under the age of 14. Defendant's misconduct with B. bridges the conduct with K. and T. not only in terms of time, but in his increasing romantic obsession with young girls. Considering the evidence as a whole, we reject defendant's arguments relating to Evidence Code sections 1108 and 352.

14

## A.

### *Prior Acts Evidence*

In May 2014, the Sacramento County District Attorney filed a third amended felony complaint against defendant to allege nine offenses committed against T. and three offenses against K. Defense counsel moved to dismiss the charges involving K., and the trial court granted the motion. The trial court found the charges against K. were too remote, explaining that "due to the passage of time and loss and/or destruction of evidence, defendant has suffered sufficient prejudice to warrant dismissal of" the counts involving K. The trial court noted K. reported the molestations 12 years earlier and they "were investigated to some degree." However, the prosecution "made a deliberate choice" not to bring charges based on the conduct against K. because defendant had recently been convicted by plea of a molestation of B. The trial court also found much of the evidence surrounding the offenses against K. had been lost. The original investigator suffered dementia, and no investigative reports survived. The only evidence remaining was a written transcript of an interview with K. in December 2001. After the trial court dismissed the charges for offenses against K., only the charges involving T. remained in this case.

Prior to trial, defense counsel moved to exclude evidence relating to K. and B. from being admitted as propensity evidence under Evidence Code section 1108. The trial court deferred ruling on the motion. During B.'s testimony, defense counsel objected and referred to the trial court's in limine rulings. Outside the presence of the jury, defense counsel explained that his objection pertained to the admission of the testimony under Evidence Code sections 1108 and 352.

15

## B.

### *Admission of Propensity Evidence Under Evidence Code Sections 1108 and 352*

Evidence Code section 1101, subdivision (a), sets forth the general rule that propensity evidence is not admissible to prove a defendant's conduct on a specific occasion. (*People v. Jackson* (2016) 1 Cal.5th 269, 299.) However, Evidence Code section 1108 "carves out an exception" to this general rule when a criminal defendant is charged with a sex offense. (*People v. Daveggio and Michaud* (2018) 4 Cal.5th 790, 823 (*Daveggio*).) To this end, subdivision (a) of Evidence Code section 1108 provides that when a "defendant is accused of a sexual offense, evidence of the defendant's commission of another sexual offense or offenses is not made inadmissible by Section 1101, if the evidence is not inadmissible pursuant to Section 352." Under Evidence Code section 352, the trial court "may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

The California Supreme Court has explained the analysis for determining the admissibility of propensity evidence when a criminal defendant is charged with sex offenses as follows: "To determine whether section 1108 evidence is admissible, trial courts must engage in a 'careful weighing process' under section 352. ([*People v.*] *Falsetta* [(1999)] 21 Cal.4th [903,] 917.) 'Rather than admit or exclude every sex offense a defendant commits, trial judges must consider such factors as its nature, relevance, and possible remoteness, the degree of certainty of its commission and the likelihood of confusing, misleading, or distracting the jurors from their main inquiry, its similarity to the charged offense, its likely prejudicial impact on the jurors, the burden on the defendant in defending against the uncharged offense, and the availability of less prejudicial alternatives to its outright admission, such as admitting some but not all of the

defendant's other sex offenses, or excluding irrelevant though inflammatory details surrounding the offense.  [Citations.]'  (*Ibid.*)"  (*Daveggio*, *supra*, 4 Cal.5th at pp. 823-824.)

We review a challenge to the trial court's admission of evidence under Evidence Code section 1108 for abuse of discretion.  (*Daveggio, supra,* 4 Cal.5th at p. 824.)  " 'Like any ruling under section 352, the trial court's ruling admitting evidence under section 1108 is subject to review for abuse of discretion.'  [(*People v. Story* (2009) 45 Cal.4th 1282, 1295.]  ' " ' "Evidence is not prejudicial, as that term is used in a [Evidence Code] section 352 context, merely because it undermines the opponent's position or shores up that of the proponent.  The ability to do so is what makes evidence relevant.  The code speaks in terms of *undue* prejudice.  Unless the dangers of undue prejudice, confusion, or time consumption ' "substantially outweigh" ' the probative value of relevant evidence, a section 352 objection should fail.  [Citation.]  ' "The 'prejudice' referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues. . . ." ' " ' " ' ' " ' "The prejudice that section 352 ' "is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence."  [Citations.]  "Rather, the statute uses the word in its etymological sense of 'prejudging' a person or cause on the basis of extraneous factors." ' " ' " '  ([*People v.*] *Bryant*[, *Smith and Wheeler* (2014)] 60 Cal.4th [335,] 408.)"  (*Daveggio*, *supra*, 4 Cal.5th at pp. 823-824.)

### C.

### *Evidence Relating to Victims K. and B.*

The evidence of defendant's prior sexual acts against K. and B. was similar to the charged offenses against T. so that the propensity evidence was highly probative on the issue of whether defendant committed the charged offenses.

Both K. and T. were close, nonbiological family members who were around the same age as his daughters. K. was his stepdaughter and T. was his niece. Defendant sexually molested both by climbing on top of them, pinning them down, removing their clothing before removing his, and then rubbing his erect penis on the outside of their genitalia. Both victims described it as "humping." Defendant made K. feel like she had done something wrong and told her she would get in trouble if she disclosed the sexual incidents. Likewise, defendant told T. not to tell anyone about their relationship because she would just "make things bad" for herself.

Defendant engaged in similar sexual molestations of both B. and T. He removed B.'s clothes before removing his own. He touched and kissed B.'s breasts and genitalia. Then defendant got on top of her, pinned her down, pressed his genital area to her vaginal area. Defendant finished by telling her that she would get in trouble if she told anyone. The next morning, defendant acted as if nothing had happened. In his first sexual molestation of T., defendant took off her clothes before removing his own. Defendant's penis was erect and he began "dry humping" her while holding her down. Afterward, defendant told her not to disclose the incident because it would make things bad for her.

Defendant abused his position of trust and authority in molesting B. and T. Defendant used his position as B.'s church mentor and counselor to spend time with her. T. testified she had an "admiration for him as an older adult." Defendant used his access to B. and T. to spend time alone with each of them. He spoke to both young girls as if they were grown women, obsessively expressed romantic feelings for them, and referred to each of them as his wife. Defendant gave B. love poems and he sent T. many messages professing romantic love. He gave both cell phones so that he could communicate in secret with each of them and avoid their parents' knowledge of his messages to them.

The prior acts evidence showed defendant abused his positions of trust and authority, cultivated secret relationships with girls under the age of 14, and focused

18

obsessively on inappropriate romanticism.  Defendant's conduct toward his victims involved climbing on top of them, removing their clothes before removing his, then rubbing his penis against them.  He ended by threatening them not to tell anyone.

The high degree of similarity in defendant's sexual misconduct toward K., B., and T. balanced out the remoteness of time among the molestations committed in 1994, around 1999 to 2000, and 2009.  (*People v. Waples* (2000) 79 Cal.App.4th 1389, 1395 [collecting authority holding 20 years is not too remote in time for evidence of prior acts of sexual misconduct].)  Although defendant points out that the trial court dismissed the charges involving acts against K. as being too remote in time, the analyses for bringing charges and admitting propensity evidence are different.  (See, e.g., *People v. Leon* (2015) 61 Cal.4th 569, 597 [holding trial court did not err in allowing evidence relating to dismissed charges to be admitted to show evidence of motive and intent].)  The dismissal of charges does not prevent evidence from those charges from being admitted in a trial on the remaining charges.  (*Ibid.*)  Under Evidence Code section 1108, the test focuses on whether the prior acts evidence was sufficiently similar to show propensity.  (*Daveggio*, *supra*, 4 Cal.5th at pp. 823-824.)  As we have explained, the similarities between defendant's misconduct against K., B., and T. rendered the prior acts evidence admissible under Evidence Code section 1108.

**D.**

### *Probative Value of the Propensity Evidence*

The prior acts evidence was sufficiently similar to the charged offenses to be highly probative on the issue of whether defendant molested T.  Defendant denied engaging in any sexual misconduct with T. or sending her any romantic messages.  The prior acts evidence showed that defendant had a propensity for sexual gratification with young girls over whom he had authority as a father, uncle, or mentor.  Defendant engaged in similar molestations of K., B., and T. when he got on top of each of them, pinned them

19

down, removed their clothing, took off his own clothes, and rubbed his penis against their genital areas. Defendant's conduct with B. and T. showed he would become excessively romantic toward young girls. Under Evidence Code section 1108, "evidence of a 'prior sexual offense is indisputably relevant in a prosecution for another sexual offense.' ([*People v.*] *Fitch* [(1997)] 55 Cal.App.4th [172,] 179.) Indeed, the reason for excluding evidence of prior sexual offenses in such cases is not because that evidence lacks probative value; rather, it is because ' "it has too much." [Citation.]' (*Ibid.*)" (*People v. Branch* (2001) 91 Cal.App.4th 274, 282-283.)

The evidence involving K. and B. was not any more inflammatory than that introduced in relation to T. Indeed, the sexual molestations of K., B., and T. were all similar. Compared to defendant's thousands of obsessive messages to T., his communications with K. and B. were relatively tame. Defendant's many incidents of kissing T., rubbing her legs, and molesting her were more damaging than his conduct against K. and B. The testimony given by K. and B. was not protracted. Instead, K. and B. offered testimony that was clear and concise. There was no danger the jury was confused by the incidents that were separated by time and victim. In short, the probative value outweighed any undue prejudice. The trial court did not err in admitting the propensity evidence.

## II

### *Due Process Challenge to the Admission of Propensity Evidence*

Defendant argues the admission of propensity evidence under Evidence Code section 1108 violated his rights under the due process clause of the Fourteenth Amendment. In so arguing, defendant acknowledges his argument has been rejected by the California Supreme Court in *People v. Loy* (2011) 52 Cal.4th 46 and in *People v. Falsetta*, *supra*, 21 Cal.4th 903. He also acknowledges the same challenge has been rejected by the Ninth Circuit in *United States v. LeMay* (9th Cir. 2001) 260 F.3d 1018.

Nonetheless, defendant asserts the contention for purposes of preserving it for further appellate review. We follow our Supreme Court's holdings in *Loy* and *Falsetta* to reject his due process challenge. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

### III

### *Cruel and Unusual Punishment*

Defendant contends his prison sentence of 440 years to life violates California and federal constitutional prohibitions on cruel and unusual punishments. We are not persuaded.

The California Constitution provides that "[c]ruel or unusual punishment may not be inflicted or excessive fines imposed." (Cal. Const., art. I, § 17.) A prison sentence violates this prohibition on cruel and usual punishment "if, although not cruel or unusual in its method, it is so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity." (*In re Lynch* (1972) 8 Cal.3d 410, 424, fn. omitted.) "The main technique of analysis under California law is to consider the nature both of the offense and of the offender. (*People v. Dillon* (1983) 34 Cal.3d 441, 479.) The nature of the offense is viewed both in the abstract and in the totality of circumstances surrounding its actual commission; the nature of the offender focuses on the particular person before the court, the inquiry being whether the punishment is grossly disproportionate to the defendant's individual culpability, as shown by such factors as age, prior criminality, personal characteristics, and state of mind. (*People v. Dillon, supra,* 34 Cal.3d at p. 479; *People v. Weddle* [(1991)] 1 Cal.App.4th [1190,] 1197-1198 & fn. 8.)" (*People v. Martinez* (1999) 76 Cal.App.4th 489, 494.)

A lengthy sentence by itself does not establish cruel and unusual punishment. Case law shows California's "appellate courts have held that lengthy sentences for multiple sex crimes do not constitute cruel or unusual punishment." (*People v.*

*Bestelmeyer* (1985) 166 Cal.App.3d 520, 531 [affirming sentence of 129 years for multiple offenses committed against defendant's stepdaughter].) This court upheld a sentence of 135 years to life for multiple counts of child sexual abuse in *People v. Retanan* (2007) 154 Cal.App.4th 1219 (*Retanan*). In rejecting a challenge to the sentence as cruel and unusual punishment, this court recognized that "the sentence imposed is substantially longer than [defendant's] possible life span." (*Id.* at p. 1230.)

Here, defendant abused his position of authority to commit multiple sexual molestations of a young girl who looked up to him. During his first molestation of T., he held her down while he sexually gratified himself while she struggled and told him to stop. A half an hour later, he momentarily recognized his wrongdoing when he came back to apologize. But he continued to molest T. by meeting with her twice a week for a year when he kissed her and rubbed her legs. He psychologically scarred T. by sending her thousands of inappropriately romantic messages when she was not yet 14 years old. At the sentencing hearing, T. testified: "I feel I had years taken away from my childhood that I will never get back, and the events and trauma I experienced for many years distorted my view of normal sexual experiences and my ability to form healthy and functional relationships with people my age. My self-image and confidence became extremely fragile following the trauma I experienced."

T. was defendant's most recent victim. He previously molested K. and B. while they were under the age of 14 as well. Indeed, his sexual acts against T. were preceded by similar crimes against two additional victims. T. represented the third instance of defendant abusing his position of authority to commit sex offenses against girls who trusted him. In view of defendant's crimes, the vulnerability of his victims, and his pattern of molestations involving three victims, defendant's sentence did not violate the California Constitution.

We also reject defendant's contention that his punishment is disproportionate because he received a lengthier sentence than he would have for a single count of murder.

22

Defendant committed multiple counts of sexual abuse of multiple victims over the span of more than two decades. "When the fundamental nature of the offense and the offender differ, comparison for proportionality is not possible. The seriousness of the threat a particular offense poses to society is not solely dependent on whether it involves physical injury. Consequently, the commission of a single act of murder, while heinous and severely punished, cannot be compared with the commission of multiple felonies." (*People v. Cooper* (1996) 43 Cal.App.4th 815, 826.) The sentence does not violate the California Constitution.

Likewise, we reject defendant's argument that his sentence violates the Eighth Amendment of the United States Constitution because "the principles developed by our court are similar to those developed by the United States Supreme Court." (*People v. Barrera* (1993) 14 Cal.App.4th 1555, 1566, fn. 7, citing *Solem v. Helm* (1983) 463 U.S. 277, 290-292 [77 L.Ed.2d 637].) "The Eighth Amendment contains a ' "narrow proportionality principle" that "applies to noncapital sentences." ' (*Ewing v. California* (2003) 538 U.S. 11, 20 [155 L.Ed.2d 108].) The Eighth Amendment 'forbids only extreme sentences that are "grossly disproportionate" to the crime.' (*Harmelin v. Michigan* (1991) 501 U.S. 957, 1001 [115 L.Ed.2d 836] (conc. opn. of Kennedy, J.) (*Harmelin*).) Reviewing courts must ' "grant substantial deference to the broad authority that legislatures necessarily possess in determining the types and limits of punishments for crimes." ' (*Id.,* at p. 999 (conc. opn. of Kennedy, J.), quoting *Solem v. Helm*[, *supra*, 463 U.S. at p.] 290.)" (*People v. Edwards* (2019) 34 Cal.App.5th 183, 190-191.)

Our deference is especially pronounced with sentences specified by the Legislature for sexual abuse of children. On this point, the United States Supreme Court has noted that "[t]he sexual abuse of a child is a most serious crime and an act repugnant to the moral instincts of a decent people." (*Ashcroft v. Free Speech Coalition* (2002) 535 U.S. 234, 244 [152 L.Ed.2d 403].) Here, defendant's sentence was constructed from nine separate felonies – including a forcible sexual act on a particularly vulnerable preteen

23

girl. Defendant's multiple felonies against T. capped his history of sexual abuse against K. and B. that also included forcible sexual acts against each of these young victims. Under the circumstances of this case, the sentence does not violate the Eighth Amendment.

**IV**

*Consecutive Sentencing*

Defendant contends the trial court abused its discretion in imposing consecutive sentences under section 667, subdivision (c)(6), despite having discretion to make the terms concurrent. Defendant does not argue that the consecutive sentencing violates section 667. Instead, defendant asserts that "[i]t was *unnecessary* to impose consecutive terms on counts 5 and 9 for kissing the victim when defendant had already received two 50-year terms for other acts committed on the same occasion in the same course of conduct." (Italics added.) Defendant's argument appears to be based on a concurrence by Justice Mosk in *People v. Deloza* (1998) 18 Cal.4th 585 (*Deloza*). We reject the argument.

**A.**

*Relevant Counts of Conviction*

Count three charged defendant with touching T.'s breasts in his truck and count five related to the first time defendant French-kissed T. in his truck. T. testified that these events did not occur on the same day. In his reply, defendant acknowledges these events did not occur on the same day.

Count eight charged defendant with pressing his penis against T. while on her parent's bed, and count nine charged him with French-kissing her on the same bed. Defendant and T. had been kissing on the couch when he led her into her parent's bedroom and onto their bed. He French-kissed her in the same manner he "often" did. Defendant rubbed his erect penis against her body until he had a "violent collapse."

24

## B.

### *Analysis*

Defendant relies on Justice Mosk's concurrence in *Deloza*, *supra*, 18 Cal.4th 585. In *Deloza*, Justice Mosk concurred in a judgment holding trial courts have discretion to impose concurrent or consecutive sentences for convictions committed on the same occasion within the meaning of section 1170.12, subdivision (a)(6). (*Deloza,* at p. 600 (conc. opn. of Mosk, J.).) Justice Mosk opined that a 111-year sentence in prison was constitutionally excessive. (*Id.* at pp. 600-601.) Justice Mosk would have held that "[t]he maximum sentence that should be imposed is one a defendant is able to serve: life imprisonment." (*Id.* at p. 602.) The categorical rule Justice Mosk would have adopted, limiting *all* prison terms to a single life sentence has not been adopted by California courts.

We reject the proposition "that any sentence longer than the human lifespan is inherently cruel and unusual. (*Deloza*[, *supra*,] 18 Cal.4th [at pp.] 600-601 (conc. opn. of Mosk, J.).) As we stated when confronted with the same argument in *People v. Byrd* (2001) 89 Cal.App.4th 1373, 1383, ' "no opinion has value as a precedent on points as to which there is no agreement of a majority of the court. [Citations.]" [Citations.] Because no other justice on our Supreme Court joined in Justice Mosk's concurring opinion [in *Deloza*], it has no precedential value.' " (*Retanan*, *supra*, 154 Cal.App.4th at p. 1231.) We have already rejected defendant's assertion that his sentence constitutes cruel and unusual punishment in part III, above. The addition of the reasoning of Justice Mosk's concurrence in *Deloza* does not change our conclusion that the trial court imposed a constitutionally permissible prison sentence.

25

# V

## *Senate Bill No. 1393*

Defendant argues we must remand for resentencing to allow the trial court to exercise its newly acquired discretion under Senate Bill No. 1393 (2017-2018 Reg. Sess.) (Stats. 2018, ch. 1013, §§ 1, 2), which became effective after his sentencing.  The Attorney General agrees with defendant that the sentencing discretion conferred by Senate Bill No. 1393 is fully retroactive.  However, the Attorney General contends remand would be futile in this case in light of the trial court's statements during the sentencing hearing.  Based on the record, we conclude remand would be futile.

### A.

### *Sentence Enhancements Under Section 667, Subdivision (a)*

In June 2018, the trial court sentenced defendant to serve a total term of 40 years plus 400 years to life.  For the main component of 400 years, the trial court imposed consecutive terms of 50 years to life for each of defendant's eight felony convictions.  The trial court explained:

"Even if consecutive sentence was not mandated by [section 667, subdivision (c)(6)], the Court would impose consecutive sentences for the following reasons:  I would refer to Rule of Court 4.425 which allows the Court to consider any circumstances in aggravation and the facts related to the crimes.  I want to add that I don't believe that the probation department has included every aggravating factor.  The Court would add 4.421(a)(3), that the victim was particularly vulnerable as an additional aggravating factor.  I find that the other aggravating factors indeed do apply.  *I find there are no mitigating factors that apply in this case*.  [¶] . . . [¶]  The crimes involve separate acts, and given those circumstances, the Court believes that a sentence of 400 years to life, *every day of it, is warranted by the facts and circumstances of this case*."  (Italics added.)

26

The total sentence also includes eight consecutive terms of five years as enhancements under section 667, subdivision (a), for defendant's prior felony conviction. When imposing these eight sentence enhancements, the trial court explained: "There's also a five-year prior that is alleged as to each count . . . . [T]he total sentence in this case will be 40 years state prison determinate term, followed by 400 years to life indeterminate term. *The Court believes it is a just term and a fair term.*" (Italics added.)

**B.**

### *Remand Would Be an Idle Act*

A criminal defendant is entitled to have the trial court exercise its lawful discretion. Consequently, " '[w]hen the record shows that the trial court proceeded with sentencing on the . . . assumption it lacked discretion, remand is necessary so that the trial court may have the opportunity to exercise its sentencing discretion at a new sentencing hearing.' " (*People v. McDaniels* (2018) 22 Cal.App.5th 420, 425, quoting *People v. Brown* (2007) 147 Cal.App.4th 1213, 1228.) Even so, "if ' "the record shows that the trial court would not have exercised its discretion even if it believed it could do so, then remand would be an idle act and is not required." ' " (*McDaniels*, at p. 425, quoting *People v. Gamble* (2008) 164 Cal.App.4th 891, 901.) As a consequence, "[r]emand is required unless the record reveals a clear indication that the trial court would not have reduced the sentence even if at the time of sentencing it had the discretion to do so." (*People v. Almanza* (2018) 24 Cal.App.5th 1104, 1110.)

The record in this case shows the trial court would not have reduced defendant's sentence regardless of discretion to select lesser or concurrent terms. The trial court found there were *no* mitigating circumstances in the commission of defendant's crimes against T. By contrast, the trial court found multiple aggravating circumstances and emphasized T. was a particularly vulnerable victim. Although the consideration of aggravating and mitigating factors was made in the context of defendant's base sentence,

the trial court would not have incongruously found mitigating circumstances for the five-year sentence enhancements.  Notably, the trial court expressly found the prison term of 440 years to life constitutes a just and fair term.  The trial court's statements on the record during the sentencing hearing clearly indicate that remand for exercise of discretion under Senate Bill No. 1393 would be an idle act.

## DISPOSITION

The judgment is affirmed.


/s/
HOCH, J.


We concur:


/s/
HULL, Acting P. J.


/s/
BUTZ, J.*

---

* Retired Associate Justice of the Court of Appeal, Third Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.