Filed 1/4/21  P. v. Salas CA2/6

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| THE PEOPLE OF THE STATE OF CALIFORNIA,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>ALEJANDRO SALAS,<br><br>Defendant and Appellant. | 2d Crim. No. B301365<br>(Super. Ct. No. 2008006111)<br>(Ventura County) |

Alejandro Salas appeals from a postjudgment order granting in part and denying in part his motion for resentencing under Penal Code[1] section 1170.95.  In 2010, a jury convicted Salas of second degree murder (§ 187, subd. (a)) and three counts of attempted murder (§§ 187, 664).  The jury also found true gang and firearm enhancement allegations as to all four counts.  (§§ 186.22, subd. (b)(1), 12022.53, subds. (d), (e)(1)).  Salas was

---

[1] All statutory references are to the Penal Code.

sentenced to an aggregate term of 128 years and 8 months to life in state prison.

In January 2019, Salas filed a petition for resentencing under section 1170.95. Following an evidentiary hearing, the court found Salas was entitled to relief on his conviction of second degree murder, vacated the true findings on the gang and firearm use allegations as to that count, and redesignated the conviction as a conviction for conspiracy to commit a battery (§ 182, subd. (a)(1)). The court then resentenced Salas to an aggregate term of 75 years to life plus 14 years and four months in state prison.[2]

Salas contends the court erred in finding he was ineligible for resentencing as to his convictions for attempted murder. He also contends the court erred in concluding that Senate Bill 620– which amended the law to give trial courts the discretion to strike or dismiss section 12022.53 firearm enhancements in the interests of justice pursuant to section 1385–did not give the court the authority to strike the charged enhancements and instead impose lesser uncharged statutory enhancements. Finally, he claims the matter must be remanded for resentencing because the court was unaware of its discretion to impose concurrent rather than consecutive terms on the firearm enhancements imposed under section 12022.53, subdivision (d). We affirm.

---

[2] Appellant was convicted of attempted murder on counts 10, 11, and 12. On count 10, the court sentenced him to the upper term of 9 years, plus 25 years to life for the firearm enhancement. On counts 11 and 12, appellant was sentenced to consecutive terms of two years and four months (one-third the midterm) plus 25 years to life for the firearm enhancements. On the redesignated offense of conspiracy to commit a battery, the court imposed a consecutive eight-month prison term.

## STATEMENT OF FACTS

The relevant facts are derived from our 2013 unpublished opinion affirming the convictions of Salas and codefendants Lino Hernandez and Alvino Joe Hernandez. (*People v. Hernandez et al.* (June 24, 2013, B229363) [nonpub. opn.].) In 2006, Salas, Lino, and Alvino were members of Colonia Chiques (Colonia) gang in Oxnard. Salas and Alvino lived in an apartment building at 2011 North Ventura Road in Oxnard (2011 building). Victim Abraham Lopez and his brothers Moises Lopez and Hector Lopez lived in an apartment building at 2045 North Ventura Road (the Lopez apartment).

Abraham and Hector belonged to a tagging group called DSK, which had about 20 members. Moises associated with DSK. On May 5, 2006, DSK member Richard Gonzalez went to a party at the Lopez apartment. During the party, two Colonia members, including Andy Sanchez (Panda), jumped DSK member Jose Delgadillo (Ohno) in the alley behind the building.

Sometime later, before September 2006, Colonia and DSK arranged for Panda and Ohno to fight again. Alvino and Salas accompanied Panda to the alley behind the Lopez apartment. Panda and Ohno had just started fighting when two more Colonia members arrived, armed with aluminum baseball bats. Abraham, Moises, Hector and his friend Ralph, and a teenager were there. Abraham or Moises yelled something like, "I thought this was supposed to be a fistfight. You guys bring weapons." Alvino held a knife against the teenager and said, "grab your own bats." A Colonia member struck Moises with a bat, which Moises grabbed and held. The altercation ended after Alvino pushed the teenager toward Hector.

3

On September 4, 2006, Salas told Gonzalez, Octavio and Moises that he wanted to arrange a fistfight between a Colonia member and "Johnny." Gonzalez, Moises and Octavio went to the Lopez apartment and drank beer. Moises's girlfriend, Michele White, drove to the Lopez apartment at around 6:30 p.m. to retrieve her game console from Moises. White saw Salas's brother-in-law, Alonzo Hernandez, make a crude gesture at Moises while she was outside with him. Salas, Alvino, and Lino then approached White and Moises. Moises called his brothers to warn them that they were there, and asked them to bring a gun.

Moises and White entered the apartment building's courtyard from the alley. Salas, Alvino, and Lino followed and surrounded them. Octavio, Abraham, Moises, and Gonzalez went downstairs and entered the courtyard. White started to walk toward Ventura Road but turned back after Lino said, "Where are you going? It's all right. Nothing's going to happen."

Octavio and Abraham were in the southwest section of the courtyard facing Lino and Alvino, each of whom had a gun hidden beneath his sweatshirt. Lino told Octavio, "My carnal [brother] wants you to keep his name out of your fucking mouth." He asked Octavio, "Who is going to get down [fight]?" Octavio responded that he would fight if no weapons were used. Pointing at Lino's sweatshirt, Octavio asked, "What's that you got there?" Lino pulled out his gun and started firing immediately. Alvino pulled out a nine millimeter handgun and also started firing. Octavio was shot several times and fell to the ground. Gonzalez started running away and was shot seven times. Gonzalez then aimed his firearm toward Lino, fired several times, and tossed it in the bushes. White was shot in the leg.

After Lino and Alvino started shooting, several bullets hit Abraham.  He fell, loaded his gun, and returned fire.  Alvino pistol-whipped Abraham, shot him in the face, took his gun, and ran away with Lino.

Police at the crime scene recovered 21 expended casings from a semi-automatic TEC-9 weapon, an expended casing from a nine millimeter Makarov handgun, two expended casings and one misfired bullet from a .380 caliber handgun, and six expended casings from a .357 revolver.  Several days later, a Makarov handgun, a TEC-9 weapon and magazine, and a nine-millimeter magazine with live rounds were recovered from Alvino's vehicle.  Analyses connected those weapons to evidence from the Lopez courtyard and the shooting victims.

Octavio died from his gunshot wounds.  Abraham lost an eye and suffered other wounds in his chest, shoulder, forearm, face, legs, and buttocks.  Gonzalez suffered permanent, disabling nerve damage, lost the ability to move his left foot, and needed a leg brace.  White suffered a gunshot wound that pierced an artery and left numbness in her left leg.

Police officers interviewed Lino on September 26, 2006, and Salas on October 4, 2006.  Both men denied that they were in Oxnard at the time of the shootings and claimed they no longer associated with Colonia.  When Salas was interviewed again in January 2008, he again denied that he was in Oxnard when the shootings occurred and claimed he did not associate with Colonia.  The mother of Salas's girlfriend initially told officers that Salas was with her family in Bellflower that day, but later admitted this was false and that she had been pressured to provide Salas with an alibi.

Alvino testified on his own behalf.  On the day of the shootings, Salas called Alvino, said there was going to be a fight between a Colonia member and a DSK member, and asked Alvino to provide "back up."  About 90 minutes later, Alvino, Lino, and a fellow Colonia associate named Abel rode with a man named "Loc" to a home near Salas's apartment.  Alvino was carrying the TEC-9 and the Makarov.  They met with Salas and Panda for about 20 minutes in an alley.  Alvino gave Lino the TEC-9.

Lino and Alvino started walking toward the Lopez apartment, followed by Salas and Abel.  Alvino and Lino encountered Moises and White in the alley.  Alvino then saw Abraham and Octavio in the courtyard and Gonzalez came downstairs.  Alvino had been "picking" at his waistband and Octavio asked what was in his waistband.  Alvino "got scared" when he saw Gonzalez reaching toward his hip.  Before Gonzalez or anyone with DSK displayed a firearm, Alvino pulled out his gun, started shooting, and struck Gonzalez once.  Alvino's gun then jammed and Lino started shooting.  Abraham and Gonzales fired their guns.  Alvino saw Abraham lying on the ground, aiming a gun at Lino.  Alvino ran to Abraham, pistol-whipped him, and took his .380.

## DISCUSSION
### *§ 1170.95 - Attempted Murder*

Salas contends the trial court erred in finding that section 1170.95 does not apply to his convictions of attempted murder and that denying him relief for those convictions violates his equal protection rights.  We disagree.

In 2018, the Legislature enacted Senate Bill No. 1437, which eliminated liability for murder under the natural and probable consequences doctrine.  (*People v. Lopez* (2019) 38

Cal.App.5th 1087, 1092-1093 (*Lopez*), review granted Nov. 13, 2019, S258175.) The natural and probable consequences doctrine provides that "'[a] person who knowingly aids and abets criminal conduct is guilty of not only the intended crime [target offense] but also of any other crime the perpetrator actually commits [nontarget offense] that is a natural and probable consequence of the intended crime.'" (*People v. Medina* (2009) 46 Cal.4th 913, 920.) "'By its very nature, aider and abettor culpability under the natural and probable consequences doctrine is not premised upon the intention of the aider and abettor to commit the nontarget offense because the nontarget offense was not intended at all. It imposes vicarious liability for any offense committed by the direct perpetrator that is a natural and probable consequence of the target offense.'" (*People v. Chiu* (2014) 59 Cal.4th 155, 164, superseded by statute in *Lopez, supra*, 38 Cal.App.5th at p. 1103.)

Senate Bill No. 1437 was enacted "to amend the felony murder rule and the natural and probable consequences doctrine, as it relates to *murder*, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life." (Stats. 2018, ch. 1015, § 1(f), p. 6674, italics added; see *People v. Martinez* (2019) 31 Cal.App.5th 719, 723.) Section 188 was amended to require that "in order to be convicted of murder, a principal in a crime shall act with malice aforethought. Malice shall not be imputed to a person based solely on his or her participation in a crime." (§ 188, subd. (a)(3); Stats. 2018, ch. 1015, § 2, p. 6675; *In re R.G.* (2019) 35 Cal.App.5th 141, 144.) As a result of this amendment, the natural and probable

7

consequences doctrine can no longer be used to support a murder conviction. (*Lopez, supra*, 38 Cal.App.5th at pp. 1103 & fn. 9.)

The legislation also enacted section 1170.95 to allow individuals previously convicted of murder under a natural and probable consequences theory to petition the court to have their murder convictions vacated and to be resentenced. A petitioner is eligible for resentencing if three conditions apply: (1) A charging document "was filed against the petitioner that allowed the prosecution to proceed under a theory of felony murder or murder under the natural and probable consequences doctrine[;] (2) The petitioner was convicted of first degree or second degree murder following a trial or accepted a plea . . . ; [and] (3) The petitioner could not be convicted of first or second degree murder because of changes to Section 188 or 189" made by Senate Bill No. 1437. (§ 1170.95, subd. (a).)

The plain text of section 1170.95 makes clear that Salas is ineligible for relief on his convictions of attempted murder under the plain text of section 1170.95. Although they are closely related, "[m]urder and attempted murder are separate crimes." (*Lopez, supra*, 38 Cal.App.5th at p. 1109.) Moreover, the remainder of the text of Senate Bill No. 1437 confirms that the Legislature intended the law to apply exclusively to defendants convicted of murder. The law expressly states that "[t]here is a need for statutory changes to more equitably sentence offenders in accordance with their involvement in *homicides*." (Stats. 2018, ch. 1015, § 1(b), p. 6674, italics added.) The Legislature acted "to ensure that *murder* liability is not imposed on a person who is not the actual *killer*, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life." (Stats. 2018, ch. 1015, § 1(f),

8

p. 6674, italics added.)  This is not an instance where "'resolution of the statute's ambiguities in a convincing manner is impracticable,'" such that we must apply the rule of lenity to interpret the law in the defendant's favor.  (*People v. Avery* (2002) 27 Cal.4th 49, 58.)

Every court to address the issue has concluded that individuals convicted of attempted murder are ineligible for relief under section 1170.95.  (See, e.g., *People v. Dennis* (2020) 47 Cal.App.5th 838, 844-847, review granted July 29, 2020, S262184; *Lopez*, *supra*, 38 Cal.App.5th at pp. 1104-1105; *People v. Munoz* (2019) 39 Cal.App.5th 738, 753, review granted November 26, 2019, S258234; *People v. Medrano* (2019) 42 Cal.App.5th 1001, 1016-1018, review granted Mar. 11, 2020, S259948; *People v. Larios* (2019) 42 Cal.App.5th 956, 968-969, review granted Feb. 26, 2020, S259983.)  We reach the same conclusion, pending our Supreme Court's resolution of the issue.

Salas complains that this conclusion creates an irrational result in which defendants convicted of murder are punished less severely than those convicted of attempted murder.  He relies on *People v. King* (1993) 5 Cal.4th 59, in which the court held that laws providing a benefit to juvenile defendants convicted of murder must be interpreted as providing the same benefit to attempted murderers, even though the literal text of the statute indicates otherwise.  In so holding, the court recognized that ""'language of a statute should not be given a literal meaning if doing so would result in absurd consequences which the Legislature did not intend.'""  (*Id*. at p. 69.)  As noted in *Lopez*, however, the sentencing provisions in *King* occurred because a series of unrelated statutes and Supreme Court decisions worked together in a way the Legislature had not considered or

9

anticipated.  (See *Lopez*, *supra*, 38 Cal.App.5th at pp. 1106-1107.) "Here, in contrast, we are not dealing with amendments of different statutes in separate codes at different times leading to an unintended result, but a single piece of legislation in which the Legislature unequivocally elected, both in the words it chose and its statement of purpose, to provide a benefit to one category of aiders and abettors prosecuted under the natural and probable consequences doctrine—those facing the lengthiest prison sentences—and not to others." (*Id.* at p. 1107.)

Salas also misplaces his reliance on *People v. Barrajas* (1998) 62 Cal.App.4th 926.  In that case, the court held that section 1000—which allows defendants convicted of certain drug offenses to enter a diversion program—also applies to those convicted of attempting to commit a predicate offense, even though the statute made no provision for attempts. (*Barrajas*, at p. 929 & fn. 3.)  But section 1000 applies to several different criminal offenses, most of which involve the simple possession or use of illegal drugs.  (See § 1000, subd. (a).)  Section 1170.95, by contrast, involves only the offense of murder.  When the Legislature intends for a law to apply to attempted murder, it explicitly says so in the text of a statute.  (See, e.g., § 246.1, subd. (a) [law requiring forfeiture of a vehicle used in a crime applies to attempted murder], § 667.5, subd. (c)(12) [defining attempted murder as a violent felony], § 2932, subd. (a)(1) [loss of credit for good behavior for committing attempted murder in prison].)

Moreover, it is not irrational to provide relief for defendants convicted of murder but not attempted murder.  As the court explained in *Lopez*, "the gap between a defendant's culpability in aiding and abetting the target offense and the culpability ordinarily required to convict on the nontarget offense

10

is greater in cases where the nontarget offense is murder, than where the nontarget offense is attempted murder or, in the prosecutor's discretion, aggravated assault.  The Legislature could have reasonably concluded reform in murder cases 'was more crucial or imperative.'" (*Lopez*, *supra*, 38 Cal.App.5th at p. 1112.)  Given the limited resources available for handling resentencing cases, the Legislature may have decided to make relief available only to murder cases. (See *ibid.*)

To the extent Salas asserts that the exclusion of attempted murder from section 1170.95 violates principles of equal protection, it is well-settled that "[p]ersons convicted of different crimes are not similarly situated for equal protection purposes." (*People v. Barrera* (1993) 14 Cal.App.4th 1555, 1565, citations, italics and internal quotation marks omitted.)  As the court in *Lopez* recognized, "murder is punished more severely than attempted murder" and "[t]he Legislature is permitted to treat these two groups of criminal differently."  (*Lopez*, *supra*, 38 Cal.App.5th at p. 1110; see also *People v. Munoz*, *supra*, 39 Cal.App. 5th at pp. 760-761.)

### *Firearm Enhancements (§ 12022.53, subd. (d))*

Salas contends the matter must be remanded for a new resentencing hearing because the court misunderstood the scope of its discretion to strike the section 12022.53, subdivision (d) firearm enhancements and impose lesser included uncharged enhancements, as provided in *People v. Morrison* (2019) 34 Cal.App.5th 217 (*Morrison*).  We disagree.

"""When we interpret a statute, "[o]ur fundamental task . . . is to determine the Legislature's intent so as to effectuate the law's purpose.  We first examine the statutory language, giving it a plain and commonsense meaning.  We do not examine that

11

language in isolation, but in the context of the statutory framework as a whole in order to determine its scope and purpose and to harmonize the various parts of the enactment.  If the language is clear, courts must generally follow its plain meaning unless a literal interpretation would result in absurd consequences the Legislature did not intend.'"'"'  [Citation.]  In construing any statute, 'we may not broaden or narrow the scope of the provision by reading into it language that does not appear in it or reading out of it language that does.  "Our office . . . 'is simply to ascertain and declare' what is in the relevant statutes, 'not to insert what has been omitted, or to omit what has been inserted.'"  [Citation.]  "'"[A] court . . . may not rewrite the statute to conform to an assumed intention which does not appear from its language."'"'  [Citation.]"  (*People v. Yanez* (2020) 44 Cal.App.5th 452, 458-459 (*Yanez*), review granted April 22, 2020, S260819.)

When appellant was originally sentenced, trial courts had no authority to strike or dismiss firearm enhancements imposed under section 12022.53.  Senate Bill 620, which went into effect in January 2019, amended section 12022.53 to provide that "[t]he court may, in the interest of justice pursuant to Section 1385 and at the time of sentencing, strike or dismiss an enhancement otherwise required to be imposed by this section.  The authority provided by this subdivision applies to any resentencing that may occur pursuant to any other law."  (§  12022.53, subd. (h).)

In *Morrison*, *supra*, 34 Cal.App.5th 217, the court held that in light of this amendment the trial court had the authority to strike a firearm enhancement charged and found true under section 12022.53, subdivision (d)—the punishment for which is 25 years to life—and instead impose an uncharged 10-year

12

enhancement under section 12022.53, subdivision (b), or an uncharged 20-year enhancement under subdivision (c). (*Morrison*, at pp. 222-223.)  The court in *People v. Tirado* (2019) 38 Cal.App.5th 637 (*Tirado*), review granted November 13, 2019, S257658, disagreed with *Morrison*, noting that "[n]othing in the plain language of sections 1385 or 12022.53, subdivision (h) authorizes a trial court to substitute one enhancement for another."  (*Tirado*, at p. 643.)

In *Yanez, supra*, 44 Cal.App.5th 452, the court agreed with *Tirado* and observed that "under a plain reading, the Legislature's use of the words 'strike' or 'dismiss' indicates the court's power pursuant to these sections is binary. [Citation.]" (*Yanez*, at p. 459.)  The court in *Yanez* also "decline[d] to adopt an interpretation of section 12022.53, subdivision (h) which would vest the trial court with discretionary power to essentially modify a charge brought by the prosecutor despite sufficient evidence to support such a charge."  (*Yanez*, at p. 460.)  In *People v. Garcia* (2020) 46 Cal.App.5th 786 (*Garcia*), review granted June 10, 2020, S261772, the court also agreed with *Tirado* "that section 12022.53, subdivision (h) does not grant a trial court the discretion to substitute lesser included [firearm] enhancements, at least where the greater enhancement is legally and factually valid."  (*Garcia*, at pp. 790-791.)  The court reasoned that the plain language of the statute was unambiguous, granting courts discretion solely to strike or dismiss a firearm enhancement.  (*Id.* at p. 791.)  The court further reasoned that the separation of powers vested the executive with the exclusive power to choose which enhancements to charge.  (*Id.* at pp. 791-792.)

We agree with the reasoning and holdings in *Tirado, Yanez*, and *Garcia*.  Pending further guidance from our Supreme

13

Court in its review of those decisions, we decline to follow *Morrison* and conclude that the trial court properly understood the scope of its discretion in imposing the 25-years-to-life enhancements under section 12022.53, subdivision (d).

We also reject Salas's claim that the matter must be remanded for resentencing as to the firearm enhancements imposed under subdivision (d) of section 12022.53 because the record does not reflect the court's understanding that it had the authority to order that those enhancements run concurrently rather than consecutively to each other.  As the People correctly note, the court had no such authority because it imposed consecutive terms on the underlying substantive offenses. (*People v. Oates* (2004) 32 Cal.4th 1048, 1066; *People v. Mustafaa* (1994) 22 Cal.App.4th 1305, 1311.)

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED.

PERREN, J.

We concur:

GILBERT, P. J.

YEGAN, J.

14

Derek D. Malan, Judge
Superior Court County of Ventura

_____

Jonathan E. Demson, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Charles S. Lee, and Chung L. Mar, Deputy Attorneys General, for Plaintiff and Respondent.